IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FILED

MAR 2 - 2011

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CENTRAL TELEPHONE CO.
OF VIRGINIA, et al.,

      Plaintiffs,

v.                                        Civil No. 3:09cv720

SPRINT COMMUNICATIONS CO.
OF VIRGINIA, INC., et al.,

      Defendants.

## MEMORANDUM OPINION

This matter is before the Court after a bench trial addressed to whether Sprint Communications Company LP ("Sprint") breached nineteen contracts it has with the Plaintiff telephone companies.[1] The Plaintiffs are Central Telephone Company of Virginia; United Telephone Southeast, LLC; Embarq Florida, Inc.; United Telephone Company of Indiana, Inc.; United Telephone Company of Kansas; United Telephone Company of Eastern Kansas; United Telephone Company of Southcentral Kansas; Embarq Missouri, Inc.; Embarq Minnesota, Inc.; United Telephone Company of the West; Central Telephone Company; United Telephone Company of New Jersey, Inc.; Carolina Telephone and Telegraph Company,

---

[1] Sprint Communications Company of Virginia, Inc. is also a named defendant in this action. However, given that this company is a smaller offshoot of Sprint Communications Company LP, and the fact that Sprint Communications Company LP received near exclusive attention at trial, the Defendants will be referred to collectively as simply "Sprint."

LLC; United Telephone of Ohio; United Telephone Company of the Northwest; United Telephone Company of Pennsylvania, LLC; United Telephone Company of the Carolinas LLC; United Telephone Company of Texas, Inc.; and Central Telephone Company of Texas (collectively "CenturyLink" or "the Plaintiffs"). Sprint and each of the Plaintiffs entered into Interconnection Agreements ("ICAs") from 2004 to 2005 pursuant to the Telecommunications Act of 1996 ("the Act"). The ICAs required Sprint to pay certain charges for so-called Voice-over Internet Protocol ("VoIP") telephone calls. Those charges were due under a contract provision that was in each ICA:

> Voice calls that are transmitted, in whole or in part, via the public Internet or a private IP network (VoIP) shall be compensated in the same manner as voice traffic (e.g., reciprocal compensation, interstate access and interstate access).[2]

Pl. Ex. 25 § 38.4. From the time the ICAs were executed until June 2009, Sprint paid those charges in response to monthly bills sent by the Plaintiffs. Then, in the summer of 2009, Sprint, like many companies at the time, was in considerable need of cutting costs. As part of that endeavor, Sprint, in June 2009, for the first time, disputed the Plaintiffs' charges for VoIP traffic, contending, also for the first time, that the

---

[2] Pl. Ex. 25 is the Virginia ICA which the parties agree is identical to the other eighteen ICAs at issue.

2

ICAs did not authorize the VoIP traffic charges which, for years, it had paid pursuant to the above-quoted provision.

Quite frankly, Sprint's justifications for refusing to pay access on VoIP-originated traffic, and its underlying interpretation of the ICAs, defy credulity. The record is unmistakable: Sprint entered into contracts with the Plaintiffs wherein it agreed to pay access charges on VoIP-originated traffic. Sprint's defense is founded on post hoc rationalizations developed by its in-house counsel and billing division as part of Sprint's cost-cutting efforts, and the witnesses who testified in support of the defense were not at all credible.

For the reasons set forth below, the Court finds that in refusing to pay the access charges as billed, Sprint breached its duties under the ICAs, which clearly included paying access charges for VoIP-originated traffic according to the jurisdictional endpoints of calls. Hence, judgment will be entered for the Plaintiffs.

## BACKGROUND FACTS

### 1. Origins of the Dispute

The parties' contract dispute traces in large portion to their rather peculiar relationship. When the ICAs at issue in this action were executed, the Plaintiffs and Sprint were

effectively the same company, with the former falling under the common ownership and control of the latter.  Joint Stipulation of Uncontroverted Facts ("Joint Stipulation") ¶ 6; see also Trial Transcript ("Trial Tr.") 18:17-20:3 (Cheek).  The Plaintiffs were part of Sprint's so-called "local telephone division."  Trial Tr. 16:16-17:20 (Cheek).  Sprint also had long distance, wireless, and corporate services divisions, with the last of these providing common corporate services to Sprint's various divisions.  Id. at 17:15-20, 19:14-17 (Cheek), 320:1-4 (Sichter).

The multi-divisional structure of Sprint generated a number of internal complexities.  Chief among them was managing the disparate, and oftentimes conflicting, business and regulatory objectives of Sprint's separate divisions.  Id. at 19:14-20 (Cheek).  To solve this difficulty, Sprint developed a guiding framework for its business operations called the "One Sprint Policy," the aim of which was to advance the overall interests of Sprint and its shareholders.  Id. at 20:7-8.  In practice, the Policy had Sprint's divisions take consistent public positions on telecommunications matters.  Inevitably, the policy to opt for company-wide uniformity worked to the detriment of one division over another in certain industry matters. Nonetheless, the One Sprint Policy was thought to benefit the parent corporation on the whole by avoiding inter-divisional

4

strife that might cripple the company or damage its public image, thereby permitting Sprint's divisions to complement one another to the maximum extent possible. Id. at 19:14-20:12.

In 1996, after the development of the One Sprint Policy, but before the ICAs were executed, Congress enacted the Telecommunications Act. Among its myriad features, the Act requires that, upon request, all incumbent local exchange carriers ("ILECs"), such as the Plaintiffs, must interconnect their networks with those of competing local exchange carriers ("CLECs"), such as Sprint. See 47 U.S.C. § 251(c)(2). Interconnection allows a customer of one carrier to call a customer of another carrier. When this happens, the carrier whose customer initiated the call must compensate the receiving carrier for transporting and terminating the call through its network. The Act also requires ILECs and CLECs to negotiate ICAs to establish the terms by which they will compensate one another for use of the other's network. Id. § 251(b), (c)(1). All ICAs must be approved by a state regulatory commission before they become effective. Id. § 252(e).

In April 2004, Sprint requested negotiation of new ICAs with the Plaintiffs in accordance with the Act. Sprint's request led to the execution, between 2004 and 2005, of the ICAs at issue here. These ICAs supplanted the older ICAs to which Sprint and the Plaintiffs formerly were parties. Trial Tr.

5

32:2-23 (Cheek). Sprint was prompted to seek renegotiation of its ICAs in 2004 because, around that time, Sprint executed wholesale agreements with various cable companies obligating Sprint to provide for termination of cable customers' VoIP-originated traffic. Id. at 32:2-23; see also Pl. Ex. 14 (email speaking to urgency of renegotiating ICAs). Sprint's status as a "telecommunications carrier" under the Act was a boon to the cable companies because the latter could rely on Sprint's standing as both a long distance carrier and CLEC to obtain local interconnection under the Act. Without Sprint, the cable companies likely would not have been able to terminate their customers' traffic efficiently. See Trial Tr. 34:25-35:15 (Cheek). Notably, in partnering with Sprint, the cable companies did not seek means by which to terminate their customers' local calls only; rather, the cable companies sought means by which to terminate their customers' local and long distance calls. Not surprisingly, and as will be explored further, the ICAs reflect the cable companies' objectives of providing for termination of both local and long distance traffic. Id. at 35:21-36:4.

## 2. Contract Language at Issue

The parties agreed that the Master Interconnection Agreement for the State of Virginia, executed December 1, 2004 ("Virginia ICA"), Pl. Ex. 25, is a representative example of all

ICAs in dispute. Joint Stipulation ¶ 34. The Virginia ICA is identical in all material respects to the other ICAs. Hereafter, the contract will be referred to as the ICA.

A. Section 38.4 of the ICA (VoIP Compensation Provision)

Section 38.4 of the ICA speaks directly to payment of access charges for termination of VoIP-originated traffic. Section 38.4 is part of Section 38 which is entitled "INTERCARRIER COMPENSATION." Section 38.4 reads: "Voice calls that are transmitted, in whole or in part, via the public Internet or a private IP network (VoIP) shall be compensated in the same manner as voice traffic (e.g., reciprocal compensation, interstate access and intrastate access)." Pl. Ex. 25 § 38.4.

The language of Section 38.4 is clear on its face. It provides in no uncertain terms that calls originating in VoIP format "shall be compensated in the same manner as voice traffic." The testimony of Mr. Hunsucker, a former Sprint employee once responsible for Sprint regulatory policy, confirms that, at time of the ICAs' execution, the parties understood the language to mean exactly what it says: access charges apply to VoIP-originated traffic in the same manner as any other voice call. Trial Tr. 228:14-16, 21 (Hunsucker). Indeed, this reflected Sprint's official position on VoIP traffic at the time the ICAs were executed. Under the One Sprint Policy then in place, VoIP-originated calls, like voice traffic, were subject

to the appropriate intercarrier compensation rates.  Id. at 227:12-228:3; see also Pl. Ex. 16.  Jim Burt, Sprint's current Directory of Policy, articulated this position shortly before the ICAs were signed when he submitted sworn, prepared testimony to the Florida Public Service Commission in a regulatory proceeding.  Respecting a VoIP compensation provision identical to the one in issue here, Mr. Burt testified,

> [i]t is Sprint's position that a VoIP call that originates or terminates on Sprint's network should be subject to the jurisdictionally appropriate inter-carrier compensation rates.  In other words, if the end points of the call define the call as an interstate call, interstate access charges apply.  If the end points define the call as intrastate, intrastate access charges apply. If the end points of the call define the call as local traffic, reciprocal compensation charges apply.

Pl. Ex. 16 at 7:13-18.  That, of course, is what Section 38.4 explicitly provides.

Though the One Sprint Policy cut against the interest of Sprint's long distance division, which, as a result of this policy, had to pay more for intercarrier connection than it otherwise would have, it protected the access revenue of carriers in Sprint's local telephone division.  See Trial Tr. 225:7-19 (Hunsucker).  Sprint considered that its local carriers' access revenues were more important to the overall profitability of the company than the added expense the company

incurred on the long distance end. In line with this calculus, Sprint treated VoIP-originated traffic no differently than voice calls, and it memorialized this in Section 38.4 of the ICA.

**B.    Section 38.4's Compensation Framework**

The requirement of Section 38.4 (that VoIP-originated traffic shall be compensated in the same manner as voice traffic) is supported by other provisions in Section 38. For instance, Section 38.1 provides:

> The Parties agree to "Bill and Keep" for mutual reciprocal compensation for the termination of Local Traffic on the network of one Party which originates on the network of another Party. Under Bill and Keep, each Party retains the revenues it receives from end user customers, and neither Party pays the other Party for terminating Local Traffic which is subject to the Bill and Keep compensation mechanism. . . .

Pl. Ex. 25 § 38.1. This section establishes the method of compensation for local voice calls. Under it the parties would not exchange access payments, but would interconnect the other party's local traffic without charge on the condition that the other party would do the same when roles were reversed. <u>See</u> Trial Tr. 228:17-18, 243: 2-4 (Hunsucker).

The mechanism of compensation for interconnection of long distance traffic is provided for in Section 38.2 of the Virginia ICA:

9

> Compensation for the termination of toll traffic and the origination of 800 traffic between the interconnecting parties shall be based on the applicable access charges in accordance with FCC and Commission Rules and Regulations and consistent with the provisions of Part F of this Agreement [relating to "Interconnection"].

Pl. Ex. § 38.2.

The compensation provisions in Section 38 do not set forth the specific rate at which compensation for termination of long distance traffic is due. Trial Tr. 228:22-229:1 (Hunsucker). Instead, the ICA incorporates by reference the applicable tariffs which, in turn, provide the applicable rates. That makes sense because the tariffs are voluminous and, because the tariffs are controlled by regulatory entities, they change from time to time. For those reasons, it is common practice in the industry to incorporate applicable tariffs by reference.

Long distance calls can take at least two forms: intrastate long distance calls and interstate long distance calls. Id. at 227:12-228:3, 228:16-18, 236:16-24, 279:10-12. The former category is subject to intrastate tariff rates, and the latter category is subject to interstate tariff rates. Id. at 280:22-25.

Section 38.4's directive is readily discernible when coupled with Sections 38.1 and 38.2. Section 38.4's mandate that VoIP traffic "shall be compensated in the same manner as

10

voice traffic (e.g., reciprocal compensation, interstate access and intrastate access)" simply applies the same compensation mechanisms outlined in Sections 38.1 and 38.2 for voice traffic—that is, reciprocal, "bill and keep" compensation for local traffic and either intrastate or interstate compensation based on the applicable tariff rates for long distance traffic—to traffic originating in VoIP format.

C.    The Parties' Understanding of Section 38.4

Like the Plaintiffs, Sprint understood this to be Section 38.4's effect when the ICAs were executed. Sprint, after all, paid the Plaintiffs for termination of VoIP-originated traffic in accordance with the compensation framework laid out in Section 38.4. In fact, Sprint did this without protest for the better part of five years. It was not until 2009, years after the execution of the ICAs, that Sprint first began disputing the Plaintiffs' access charges for VoIP-originated traffic. Id. at 83:23-84:20 (Cheek), 242:23-243:14, 244:11-15 (Hunsucker), 379:14-380:8 (Glover), 614:9-615:5 (Roach), 729:10-20 (Morris); see also Joint Stipulation ¶ 37.

Sprint even paid access under the terms of the ICAs after its corporate relationship with the Plaintiffs changed in 2006. Trial Tr. 729:16-20 (Morris). During and approaching 2006, Sprint perceived that the local telephone business was in a state of decline. Having recently acquired Nextel Corporation,

Sprint decided that it was in the company's best interest to jettison its local telephone division, which housed the Plaintiffs, and to spin that division off into a separate company, Embarq Corporation. Id. at 85:10-23 (Cheek); see also Joint Stipulation ¶ 7. The spin off occurred in May 2006. Joint Stipulation ¶ 8. In July 2009, CenturyTel, Inc., a Louisiana corporation, acquired Embarq and its subsidiaries, thereafter operating under the moniker "CenturyLink." Id. ¶ 9. The Plaintiffs presently fall under CenturyLink's corporate umbrella.

At trial, Sprint attempted to explain its willing payment of the Plaintiffs' access charges for VoIP-originated traffic in the years both before and after the Plaintiffs exited the company via the 2006 spinoff. Before the spinoff, but after the execution of the ICAs in 2004 and 2005, Sprint attributed its payment of the Plaintiffs' access bills to the parties' status as corporate affiliates. According to Sprint, it was not company practice to dispute bills from affiliated entities. As Mr. Morris, Sprint's senior counsel, characterized the situation, Sprint's payment of access to the Plaintiffs was like "taking money out of [Sprint's] left pocket and putting it in [Sprint's] right pocket. It all went to Momma, 'Big Sprint.'" Trial Tr. 728:9-15 (Morris). As to why Sprint continued to pay access in accordance with the Plaintiffs' bills after the

Plaintiffs were spun off into Embarq in 2006, and thus no longer part of Sprint, the Sprint witnesses based its three year acquiescence largely on Sprint's dependence on the Plaintiffs' billing systems and certain "transitional services," as well as significant financial commitments still pending among the parties. Id. at 729:16-731:10. In other words, Sprint considered its best interests to be served by paying the charges that it now says it did not owe.

According to the head of Sprint's billing division, the effect on Sprint of the global economic downturn that temporally aligned with Sprint's 2009 decision to dispute the Plaintiffs' access charges played no role in the company's abrupt change in posture in June 2009. Id. at 587:8-13 (Roach). The evidence, however, reveals that adverse economic conditions did drive Sprint to dispute the access charges that, for years, it had paid without protest. In the summer of 2009, Sprint, like many companies at the time, embarked on company-wide cost-cutting efforts. Notably, during this time period, Sprint launched a coordinated effort to contest access charges on VoIP-originated traffic with other carriers across the telecommunications industry. See id. 618:19-24; Pl. Exs. 61-62, 67.[3] In addition to disputing VoIP charges under Section 38.4 for the first time

---

[3] Sprint also sought to cut costs in a wide range of other areas beyond VoIP compensation. Trial Tr. 648:19-24 (Roach); see also Pl. Ex. 61.

in the history of the ICAs with CenturyLink, Sprint sent notices to AT&T, Verizon, Qwest, ComPartners, and One Communications, among others. Trial Tr. 618:19-24 (Roach); Pl. Exs. 61-62, 67.

The broad stroke of Sprint's refusal to pay access charges undermines its argument that it continued to pay access to the Plaintiffs after the spinoff on account of continuing dependencies and obligations peculiar to the Plaintiffs. For, if this contention is to be believed, the Court would also have to accept that Sprint's willing payment of access with these other telephone companies up until 2009 was the result of similar enduring dependencies and obligations. That scenario is neither probable, nor is it supported by the record which showed no dependencies on any of those other carriers. Also instructive is that Sprint's disputes with these other companies did not all implicate ICAs. Trial Tr. 627:16-21 (Roach). As will be discussed in detail later, a substantial part of Sprint's argument for refusing to pay the Plaintiffs' access charges is that Sprint drafted the ICAs to permit it flexibility on VoIP compensation. However, the fact that Sprint has disputed access charges with other carriers, whether or not it had executed ICAs with them, warrants the inference that, in reality, Sprint's decision to dispute access charges emanated, not from any understanding the company may have had of the ICAs' text, but from the company's decision to reduce costs.

Why Sprint would want to reduce costs—even apart from the general malaise that beset the economy in and around 2009—is apparent from internal email correspondence. That correspondence reveals that Sprint's wholesale ventures with cable companies were floundering—"tanking" in the words of one Sprint employee. Pl. Ex. 67 (email from Lisa A. Jarvis to Diane M. Heidenreich, Sept. 11, 2009). Sprint determined that disputing access charges on VoIP-originated traffic would be a step in the direction of making its relations with cable companies profitable. Id.

Further evidencing Sprint's motivation in contesting the Plaintiffs' access charges is the fact that Sprint challenged the Plaintiffs' bills in stages, progressively lowering the rate at which it was willing to compensate the Plaintiffs. In June 2009, early on in Sprint's efforts to dispute VoIP access charges, Sprint conveyed to the Plaintiffs that "the most that [it] can be charged for VoIP traffic is interstate access," because, in Sprint's estimation, the FCC had determined that VoIP traffic is interstate in nature. Pl. Ex. 54. In this way, Sprint attempted to re-rate the traffic that the Plaintiffs had billed at intrastate rates to comparably lower interstate rates. Trial Tr. 636:1-10 (Roach). Shortly thereafter, however, Sprint reached the conclusion that even re-rating traffic billed at intrastate rates to interstate rates did not produce the cost

savings that it sought to realize. In consequence, Sprint decided that it would only pay the Plaintiffs $.0007 per minute for termination of VoIP-originated traffic, a rate even lower than the Plaintiffs' interstate rates. Id. at 639:11-640:19; 642:7-17; see also Def. Ex. 133-34.

Sprint says that it settled on that rate because the FCC had established the $.0007 per-minute rate for another type of VoIP traffic. Trial Tr. 642:7-17 (Roach). But, as the record leaves no doubt, the motivating force in selecting that rate was not that Sprint honestly perceived the $.0007 rate more appropriate than the rates at which it had been billed by the Plaintiffs. What mattered for Sprint, to the exclusion of all other considerations, was that the $.0007 rate permitted the greatest savings for the company. Sprint therefore had no qualms overlooking the inconvenient detail that the $.0007 rate it chose did not apply to the type of VoIP traffic for which Sprint had received the Plaintiffs' termination services.

The fact that Sprint so cavalierly has shifted its position on the rates it is now willing to pay for VoIP-originated traffic further illustrates that its disputes were based on efforts to cut costs, rather than on a legitimately held belief that Section 38.4 did not require Sprint to pay at the levels which, for years, it had paid without protest.

16

Sprint did more than protest the Plaintiffs' current bills; it also demanded that the $.0007 rate be applied retroactively for the preceding twenty-four months. Id. at 643:18-25. In line with this stance, Sprint sought return of the portion of access charges that it had paid the Plaintiffs during that period in excess of the $.0007 rate. Id. at 644:23-25. But, rather than following the ICAs' "DISPUTE RESOLUTION" provisions, which specify procedures for resolving "bona fide disputes" between the parties, see Pl. Ex. 25 § 23, Sprint unilaterally took credits against its other bills with the Plaintiffs. Id. at 645:1-648:6.

On the whole, Sprint's conduct from mid-2009 onward reveals a company less concerned with meeting its contractual obligations than meeting its bottom line. For years before mid-2009, Sprint paid the Plaintiffs' VoIP-originated traffic charges under the ICAs. Thereafter Sprint found the same duties distasteful. The company sought to cut costs, and it expected to save at least $80 million by contesting carriers' access charges on VoIP-originated traffic. So essential to its cost-cutting initiatives were such savings that Sprint designated a group to monitor the realized savings and keep the company on track to meet its savings target. Id. at 649:5-651:21.

## D. Summary

The factual background of this action could occupy many more pages. However, rather than presenting the facts entirely as a preface to the legal principles raised by this dispute, the more sensible approach is to address additional facts as they become relevant to the legal discussion of the post-hoc rationalizations which Sprint has offered in an effort to escape its contractual obligations. The next section will thus make findings of fact as appropriate in deciding the proper application of the controlling law.

## LEGAL DISCUSSION

Under Virginia law,[4] a plaintiff must prove three elements by a preponderance of the evidence to prevail on a breach of contract claim: (1) a legally enforceable obligation existed between the defendant and plaintiff; (2) the defendant breached its obligation; and (3) the plaintiff incurred injury or damage stemming from the breach of the obligation. Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 135 (Va. 2009) (citing Filak v. George, 594 S.E.2d 610, 614 (Va. 2004)). Because the Plaintiffs have satisfied their burden as to all three elements,

---

[4] The parties agree that Virginia law and federal Fourth Circuit common law are representative of other states' law and other circuits' law on contract interpretation. Thus, they have argued and briefed this case on the basis that Virginia law controls the outcome.

they are entitled to judgment on their breach of contract claims.

This opinion will not separately address the issue of damages. By stipulation of the parties, the Plaintiffs established compensatory damages in the amount of \$18,249,647.47 (\$2,031,524.01 for CLEC local and \$16,218,123.46 for Feature Group D Trunks) through the date of July 12, 2010. Joint Stipulation ¶ 44, "Attachment 1 of Damages Stipulation"; see also Pl. Ex. 84. The Plaintiffs also stipulated, in accordance with Sections 7.2 and 7.4 of the ICA and the terms and conditions of the Plaintiffs' tariffs, late charges in the amount of \$2,416,254.74 through the date of July 12, 2010. Trial Tr. 247:17-248:3, 251:9-252:4, 260:7-14, 261:3-17, 293:7-14 (Hunsucker), 402:19-24, 403:13-20, 403:24-404:5 (Glover); Pl. Ex. 84. The Plaintiffs are entitled to both amounts.[5]

Of the three breach-of-contract elements, this dispute most implicates the first—whether a legally enforceable obligation existed between the parties. The bulk of this opinion will address why this question must be answered in the affirmative.

**1. The ICAs Establish a Legally Enforceable Obligation between Sprint and the Plaintiffs**

Whether a legally enforceable agreement exists hinges on the "objectively manifested intentions of the parties." Moore

---

[5] The parties will be required to provide current numbers for use in the final judgment.

19

v. Beaufort County N.C., 936 F.2d 159, 162 (4th Cir. 1991) (citing Piver v. Pender County Bd. Of Educ., 835 F.2d 1076 (4th Cir. 1987)). Where an agreement has been memorialized in writing, as in this action, "[t]he clearest manifestation of [the parties'] intent is the contract's plain language." Silicon Images, Inc. v. Genesis Microchip, Inc., 271 F. Supp.2d 840, 850 (E.D. Va. 2003) (citing Providence Square Assoc., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000)). Furthermore, where such written language is "clear and unambiguous, the proper interpretation is that which assigns the plain and ordinary meaning to the contract terms." Silicon Images, 271 F. Supp.2d at 850 (citing Providence Square, 211 F.3d at 850). In fact, courts may not look beyond the four corners of the written instrument when the contractual language is unambiguous on its face. Trex Co., Inc. v. ExxonMobil Oil Corp., 234 F. Supp.2d 572, 575 (E.D. Va. 2002) ("Virginia law specifically requires that, if the contract is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself" (internal quotation marks omitted)); see also Ross v. Craw, 343 S.E.2d 312, 316 (Va. 1986) ("[The court] adhere[s] to the view that contracts must be construed as written"); Langley v. Johnson, 499 S.E.2d 15, 16 (Va. Ct. App. 1998).

## A. Section 38.4 Unambiguously Provides that Access Charges Are Due for VoIP-Originated Traffic

Application of these legal principles evinces a legal duty on the part of Sprint to pay access charges on VoIP-originated calls. The ICA memorializes the parties' agreement on matters relating to interconnection generally. Section 38 of the ICA controls "Intercarrier Compensation." Section 38.4, specifically, memorializes the parties' agreement on termination of VoIP-originated traffic, the precise issue disputed in this action. That section, as already found, could not be any clearer. It directs that VoIP calls are to be compensated in the same manner as voice traffic. Pl. Ex. 25. That the compensation called for in Section 38.4 is obligatory, rather than optional or conditional on some later event, is clear from that section's unqualified use of "shall." Section 38.4's explanatory clause—"(e.g., reciprocal compensation, interstate access and intrastate access)"—only makes the section's mandate more apparent: Sprint's payment of access charges for VoIP traffic were to mirror its payment of access for voice traffic under Sections 38.1 and 38.2, which respectively establish reciprocal compensation for local calls and tariff-based compensation for non-local calls. It being the case that the parties memorialized their agreement on VoIP-related access charges in Section 38.4, and it also being the case that Section

38.4 is unambiguous on its face, the contract language is dispositive of the Plaintiffs' breach of contract claim. The dispute turns on the parties' objective intent, as unambiguously expressed in Section 38.4.

Sprint argues correctly that the ICAs themselves do not contain the tariff rates at which Sprint has been billed. Instead, the ICAs incorporate tariff rates by reference.[6] Trial Tr. 539:25-546:18 (Roach). This is significant, according to Sprint, because the ICA did not incorporate the rates at which it was billed, meaning that Sprint never agreed to them when executing the ICAs with the Plaintiffs. Sprint's position can be distilled to the contention that the ICAs do not incorporate the Plaintiffs' tariffs, wherein the access rates, as actually billed, are located.

In furtherance of this proposition, Sprint contends, among other things, that the tariffs are defined in the ICAs as standalone documents. Pl. Ex. 25 § 1.63. Sprint also argues that the ICAs' integration clause, set forth in Section 29.1, bars incorporation of the Plaintiffs' tariffs in making

---

[6] The first-order question of whether, as a matter of law, ICAs can incorporate tariffs is not in dispute. The parties concur that it is permissible for ICAs to incorporate tariffs, a position confirmed by federal precedent. See U.S. West Commc'ns, Inc. v. Sprint Commc'ns Co., L.P., 275 F.3d 1241 (10th Cir. 2002) (holding that a CLEC's decision to purchase services under the ILEC's tariff did not constitute abandonment of an ICA, but rather amended the ICA to incorporate the tariff's terms).

references to external documents "subject only to the terms of any applicable tariff on file with the State Commission or the FCC." Id. § 29.1.

Notwithstanding Sprint's protestations, the ICAs' clearly incorporate the Plaintiffs' tariffs by reference. Sprint's arguments on the subject lack merit. The fact that "tariff" is separately defined in the ICAs is irrelevant to the ability of the ICAs to incorporate the Plaintiffs' tariffs. And Section 29.1 says nothing that bars incorporation of the Plaintiffs' tariffs. At most, that section prevents the ICAs from incorporating tariffs inconsistent with tariffs filed with state commissions and the FCC.

The law does not set a particularly high threshold for incorporation of extrinsic documents. In Hertz Corp. v. Zurich Amer. Ins. Co., 496 F. Supp.2d 668 (E.D. Va. 2007), the court explained that: "[i]t is axiomatic in the law of contracts that, in order to incorporate a secondary document into a primary document, the identity of the secondary document must be readily ascertainable." Hertz, 496 F. Supp.2d at 675 (citing Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 447 (3d Cir. 2003)); see also Bd. Of Trs., Sheet Metal Workers' National Pension Fund v. DCI Signs & Awnings, Inc., No. 1:08cv15, 2008 WL 640252, at *3 (E.D. Va. Mar. 5, 2008) (citing Hertz for same proposition). Moreover, it must be clear that the parties to

the primary agreement had knowledge of, and assented to, the incorporated terms. Hertz, 496 F. Supp.2d at 675 (citing PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir. 1996)); see also Cary v. Holt's Exam'rs, 91 S.E. 188, 191 (Va. 1917). Notably, however, it is not necessary that the primary document provide explicitly that it "incorporates" the secondary document. Hertz, 496 F. Supp.2d at 675; Bd. Of Trs., Sheet Metal Workers' National Pension Fund, 2009 WL 640252 (stating that the exact language used is not important provided that the primary document plainly refers to another document).

From the text of the ICAs it is apparent that they incorporate the Plaintiff's tariffs, and the access rates provided therein. Section 38.4 provides that VoIP-originated traffic shall be compensated in the same manner as voice calls. Pl. Ex. 25 § 38.4. Section 38.2, in turn, establishes that compensation for long distance voice traffic "shall be based on applicable access charges." Id. § 38.2. The corollary is that, in calculating the compensation for VoIP-originated traffic, the parties would have to reference the Plaintiffs' tariffs, first, to locate the applicable access rate, and, second, to use that rate to calculate the access charges due. The ICAs' text can support no other reasonable interpretation. The ICAs, after all, do not contain a list of access rates upon which access charges can be calculated. If the ICAs' repeated references to

"tariffs" and "access charges" are to have any meaning, the ICAs must incorporate the Plaintiffs' tariffs by reference.

Trial testimony confirmed this common-sense construction of the ICAs. For example, Mr. Hunsucker, who had intimate knowledge of the ICAs owing to his many years as a Sprint executive, explained that he and Sprint clearly understood that Section 38.4's reference to "interstate access and intrastate access" incorporated the Plaintiffs' tariffs. See Trial Tr. 228:12-229:8 (Hunsucker). Mr. Hunsucker noted that it was common among the Plaintiff telephone carriers to have their tariffs incorporated by reference. Id. at 229:14-24. He explained that incorporation made sense from a logistical standpoint, given that the tariffs typically run thousands of pages and contain rates that regularly vary. See id. at 231:5-15; see also id. at 375:4-12 (Glover). Additionally, he explained that parties have an incentive to incorporate tariffs by reference, rather than attaching them to, or printing them in, ICAs, because tariff rates generally have been decreasing over time, meaning that parties to be billed generally stand to pay less by agreeing to tariff rates as opposed to static rates contained in ICAs. See id. 231:11-15 (Hunsucker); see also id. at 375:12-17 (Glover).

And, while the ICAs' language, standing alone, is adequate to show that the ICAs incorporate the Plaintiffs' tariffs by

reference, Sprint's own conduct in the wake of executing the ICAs is highly probative on the issue of incorporation. Sprint paid the Plaintiffs' access charges, for years and without protest, even though those access charges had been calculated using incorporated tariff rates. Sprint was fully aware of the basis of the charges it was billed and which it paid, raising the issue of the whether the ICAs incorporated the tariffs only after years of paying those bills. Sprint continued to pay access charges pursuant to the Plaintiffs' tariffs even after the 2006 spinoff. It was not until the economy took a drastic downturn, and Sprint's cable ventures faltered, that Sprint chose to dispute the Plaintiffs' tariff-based access charges. The fact that Sprint willingly paid the Plaintiffs' access charges for so long, and only contested them when faced with financial hardship, is convincing evidence that, when Sprint executed the ICAs it understood them to incorporate the tariffs.

In sum, Section 38.4 is dispositive of this dispute in the Plaintiffs' favor. As stated, that section's language clearly provides that VoIP traffic shall be compensated in the same fashion as voice traffic, and it incorporates the Plaintiffs' tariffs to make calculation of such compensation possible. Technically, the Court's analysis need proceed no further, for once it is found that an agreement is in writing and its terms are unambiguous, the law directs that the inquiry is at an end.

The unambiguous written instrument controls. Nevertheless, there is utility in considering the rest of Sprint's arguments, notwithstanding their misplaced disposition.

**B.  The ICAs' Scope is Not Limited to Interconnection of Local Traffic**

Perhaps the closest Sprint comes to tying any of its arguments to the language of the ICAs is in arguing that various provisions of the ICAs (excluding Section 38.4) evidence that the parties never intended the ICAs to apply to the non-local traffic for which the Plaintiffs seek access charges. Toward this point, Sprint proffers a variety of arguments rooted in the ICAs' text. Sprint, for example, notes that the ICAs do not define or refer to Sprint as a long distance carrier, or "IXC" in industry shorthand. Rather, as Sprint asserts, the ICAs refer to Sprint only as a "CLEC," a competitive local exchange carrier. Pl. Ex. 25 (Preamble). Sprint also draws attention to the fact that, when the abbreviation for interexchange carrier, "IXC," is used in the ICAs, it refers only to non-parties. Id. §§ 47.5.4, 54.1, 57.9. Here, Sprint's logic is that the ICAs do not contemplate Sprint terminating long distance traffic over the Plaintiffs' networks.

Further significant for Sprint is that the ICAs' make reference to "Local Interconnection" repeatedly. Sprint finds those references in the ICAs' Preamble, id. (defining "Local

Interconnection" as the parties' desire, under the ICAs, "to interconnect their local exchange networks for the purposes of transmission and termination of calls"), and in substantive provisions of the ICAs, such as Section 2.1, which speaks to the rights and obligations of the parties "with respect to the establishment of 'Local Interconnection,'" id. § 2.1.

In an attempt to bolster its contention that the parties never envisioned the ICAs reaching non-local traffic, Sprint suggests that Section 37 describes the intended scope of the ICAs as "Local Interconnection Trunk Arrangements." Id. § 37. According to Sprint, that terminology removes from the ICAs' ambit Feature Group D Trunks ("FGD Trunks"), or traffic delivered over FGD Trunks, since FGD Trunks connect long distance networks to local networks, and not local networks to other local networks. Citing the pricing tables referred to in Section 7.1, Sprint also makes the related argument that the pricing tables in the ICAs nowhere reference FGD Trunks by name. For Sprint, this means that the parties never intended Section 7.1's payment obligations to extend to long distance traffic delivered over FGD Trunks.

Sprint's narrow interpretation of the ICAs' scope suffers from numerous infirmities. First and foremost, only so much can be gained from Sprint referencing other provisions in the ICAs, but ignoring the one provision, Section 38.4, that speaks

28

directly to the issue in dispute—compensation for termination of VoIP-originated traffic. That Sprint relies on textual subtleties and nuances to support its position while failing to address the clear text of Section 38.4 in any meaningful way discloses the frailty of Sprint's position.

Second, the narrow meaning to which Sprint ascribes the ICAs' use of "Local Interconnection" is implausible in the extreme. As that term is used in the ICAs, it refers to all types of calls—both local and non-local—terminated over a local exchange network. Trial Tr. 223:24-224:7 (Hunsucker). A local exchange network, after all, is capable of receiving both local and non-local calls. Id. 235:25-236:6. Sprint, in essence, argues that the "Local" in "Local Interconnection" confines the origination of calls covered by the ICAs to local calling areas only. Were this true, though, the ICAs would have little practical significance for the parties. This is because Sprint does not even have local networks that serve VoIP customers in the calling areas covered by the Plaintiffs. Id. 523:25-524:4 (English). The VoIP-originated calls from Sprint that the Plaintiffs terminate over their local exchange networks all travel through switches in states and calling areas different from those of the Plaintiffs. Consequently, the VoIP traffic at issue in this action could not possibly travel directly from a Sprint local exchange network to one of the Plaintiffs' local

exchange networks. Sprint's interpretation of ICAs' scope thus does not comport with the actual alignment of the parties' grids insofar as VoIP traffic is concerned. Notice, too, based on the foregoing, that Sprint's reading would make all provisions speaking to VoIP in the ICAs, such as Section 38.4, invalid as beyond the ICAs' scope, since the termination of VoIP-originated traffic would never follow a direct local-exchange-to-local-exchange network path for the parties.

Third, other portions of the ICAs disclose the incredulity of Sprint's novel interpretation of the ICAs' scope. The ICAs, for example, define "access services" in their definitional section. See Pl. Ex. 25 § 1.3. If the ICAs were intended only to terminate local calls, there would be no need to define this phrase. Trial Tr. 236:16-24 (Hunsucker). Additionally, another section in the ICAs distinguishes between local traffic and non-local toll calls. See Pl. Ex. 25 § 37.1; Trial Tr. 237:7-19, 241:18-242:22 (Hunsucker). That same section also references "interexchange traffic" that, by common understanding in the industry, encompasses long distance traffic. Pl. Ex. 25 § 37.1.2; Trial Tr. 237:7-19. Section 38.4, as well, requires the payment of "interstate access" and "intrastate access" on calls in VoIP format. Those requirements would have no place in the ICAs were they limited in scope to local traffic. See Trial Tr. 77:16-21 (Cheek). These features of the ICAs leave no doubt that

the parties intended the ICAs to govern more than just local traffic.

Fourth and finally, Sprint's interpretation of Section 7.1 ignores other provisions in the ICAs addressing tariff-based payment for traffic delivered over FGD Trunks. Section 38.2, for example, provides that "[c]ompensation for the termination of toll traffic . . . between the interconnecting parties shall be based on the applicable access charges." Pl. Ex. 25 § 38.2 (emphasis added). Further, Section 38.3 provides that "[c]alls terminated to end users physically located outside of the local calling area . . . are not local calls for the purposes of intercarrier compensation and access charges shall apply." Id. § 38.3 (emphasis added). Lastly, Section 38.4, the VoIP Compensation Provision, requires that VoIP traffic shall be compensated "in the same manner as voice traffic (e.g., reciprocal compensation, interstate access and intrastate access)." Id. § 38.4 (emphasis added). Section 7.1 is not a basis to read FGD Trunks out of the scope of the ICAs.

In sum, Sprint's arguments do not withstand scrutiny. Not only do they conflict with other provisions of the ICAs, which clearly contemplate a scope beyond local traffic, but they also conflict with the operation of the parties' grids. A contract's scope is not determined by a handful of its terms taken in isolation; a contract's scope is determined by its overall

structure and content.  The overall structure and content of the

ICAs leads to the firm conclusion that the parties intended the

ICAs' scope to extend to the interconnection of both local and

non-local traffic.[7]

## C.  Section 38.4 Was Not Written to Be Intentionally Ambiguous

In an effort to justify its interpretation of Section 38.4,

Sprint argues that, in its mind, Section 38.4 was deliberately

drafted to be "ambiguous."  Trial Tr. 817:21-818:2 (Luehring).

That argument conflates "ambiguous" with "broad."  Whether

a contract is ambiguous is a question of law for the court's

determination.  Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va.

1984).  Ambiguity has a particular meaning under Virginia law;

---

[7] In addition to finding support in the ICAs' text for its
contention that the parties understood the ICAs to apply only to
local traffic, Sprint finds support for this contention in an
agreement it reached with the Plaintiffs in 2003, prior to the
execution of the ICAs in dispute.  Sprint attempts to offer this
so-called "Access Billing Agreement" as evidence that the
parties never intended the subsequently executed ICAs to govern
traffic delivered over FGD Trunks.  See Def. Ex. 110.

Once again, Sprint's argument does not survive examination.
First, the parties to this agreement were not limited to the
Plaintiffs and Sprint.  This agreement involved entities
comprising Sprint's wireless division.  Second, this agreement
was not intended to serve as a comprehensive billing agreement.
It merely set terms for the escalation of billing disputes.
Trial Tr. 175:14-17 (Cheek), 566:12-20 (Roach).  Third, this
agreement did not apply exclusively to FGD Trunk accounts.  Def.
Ex. 110 (obligating Sprint to pay "all local service minute of
use . . . bills"); see also Trial Tr. 180:4-6 (Cheek).  This
agreement is not even of marginal relevance to the parties
understanding of the ICAs' scope.

the mere fact that parties disagree over a contract's terms does not equate to ambiguity. Id. ("Contracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by [the parties] in expressing their agreement."). In order for contract language to be ambiguous, it must be capable of two reasonable interpretations. Silicon Images, 271 F. Supp.2d at 850 (citing Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999); Aetna Cas. & Sur. Co. v. Fireguard Corp., 455 S.E.2d 229, 232 (Va. 1995)). In assessing whether an interpretation is reasonable, a court is to consider the context and intent of the contracting parties. Silicon Images, 271 F. Supp.2d at 851 (citing Metric Constructors, 169 F.3d at 752; Hunt Constr. Group v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002)).

    As a matter of law, Section 38.4 is not ambiguous. It is immaterial that Sprint now objects to the plain meaning of that provision. And, it is immaterial that Sprint believes Section 38.4 lends itself to multiple interpretations. See Trial Tr. 817:19-20 (Luehring). The issue is whether Section 38.4's language is capable of two reasonable interpretations. And, simply put, it is not. At the risk of being redundant, that section's message is patently clear: VoIP calls must be compensated in the same manner as voice traffic, meaning reciprocal compensation or compensation based on interstate or

intrastate access rates. No other reasonable interpretation has been presented.

Also instructive is that none of Sprint's in-house lawyers ever told the business people involved in the preparation of the ICA template for Section 38.4 that the provision was ambiguous. Id. at 785:13-18 (Morris), 867:1-871:2 (Luehring), 985:18-878:7 (Cowin). To the extent that these lawyers—Messrs. Morris and Cowin and Ms. Luehring—now claim that Section 38.4 was drafted to be ambiguous, the Court rejects their testimony as not believable.[8]

But even assuming for argument's sake that Section 38.4 was ambiguous, the result would still not augur a Sprint victory. Sprint seems to be of the opinion that, to the extent Section 38.4 is subject to multiple interpretations, the company is free to choose the one that most suits its fancy. Lost on Sprint is the fundamental tenet of contract law that ambiguity is construed against the drafter. Williston on Contracts § 32:12 (4th ed.) ("Since the language is presumptively within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter."); see also Martin & Martin, Inc. v. Bradley Enters., Inc., 504 S.E.2d 849 (Va. 1998);

---

[8] In so doing, the Court followed the guide of the standard credibility jury instruction. 1A O'Malley, Grenig & Lee, Federal Jury Practice and Instructions, § 15.01 (5th ed. 2000).

Mahoney v. NationsBank of Virginia, N.A., 455 S.E.2d 5, 9 (Va. 1995). The record shows that Sprint drafted the standard template language that became Section 38.4 of the ICA. Trial Tr. 808:25-809:5 (Luehring). Moreover, the in-house counsel who advised the parties regarding the ICAs were, and remain today, Sprint employees. See id. at 690:25-691:1 (Morris), 805:16-17 (Luehring), 960:3-4 (Cowin). For sure, the parties' status at the time the ICAs were executed as entities of the same parent corporation complicates the application of the ambiguity rule. After all, the Plaintiffs might be considered "drafters" of the ICAs as well, since they fell under Sprint's umbrella when the parties entered into the ICAs. However, the dominant influence that Sprint employees outside the company's local telephone division wielded respecting the ICAs' terms, for all practical purposes, made Sprint the singular drafter of Section 38.4. Thus, the Plaintiffs' construction of Section 38.4 would prevail even in the event that provision were ambiguous (which it is not).

D. **Section 38.4 Was Not Written to Be Intentionally Broad**

Perhaps, Sprint meant to argue that Section 38.4 was intended to be "broad," not "ambiguous." One of Sprint's witnesses used the two words interchangeably in describing Section 38.4. See id. 816:22-817:1 (Luehring). Obviously, broad and ambiguous have two different meanings in everyday

usage; and this distinction is only amplified in the legal setting, where, as explained, the term "ambiguous" has a particular meaning borne out by caselaw. It follows that, if Section 38.4 was intended to be broad, a separate legal issue is presented.

Sprint offers several reasons as to why the parties understood Section 38.4 to stop short of requiring payment of access charges on VoIP-originated traffic. Perhaps most conspicuous of these reasons was Sprint's insistence that VoIP's tenuous status under the Telecommunications Act of 1996 at the time of the ICAs' execution bore substantially on the parties' understanding of Section 38.4. See id. at 344:13-19 (Sichter), 909:23-910:19 (Burt); Pl. Ex. 8 at 7. Sprint even went so far as to claim that, had Section 38.4 definitively required access charges for VoIP traffic, that section—and, by extension, the ICAs—would have violated federal law. See Trial Tr. 818:7-819:22 (Luehring).

The latter contention carries no weight at all. Sprint itself admits that the FCC has yet to rule on the propriety of access charges for the type of VoIP traffic at issue in this action. Id. at 818:11-14. It goes without saying that a party cannot violate federal law in an area when no federal law exists. Absent an FCC ruling on the VoIP traffic in dispute, Sprint and the Plaintiffs were free to craft an agreement

dealing with such traffic as they saw fit. See id. at 150:2-10 (Cheek).

And, Sprint's other contention, that the precarious nature of VoIP traffic under the Act somehow determined the meaning of Section 38.4 for the parties, is also unpersuasive. First, and most fundamentally, the uncertain status of the FCC's classification of VoIP traffic does not foreclose parties from agreeing, such as they did in the ICAs, to a method of payment for the termination of VoIP-originated traffic. The only scenario in which federal regulations would bear on a contract dispute such as this one were if FCC rules expressly prohibited payment of access charges on the VoIP traffic at issue, which, by Sprint's own admission, is not the case here.

Second, Section 38.4's language does not support Sprint's assertion that the provision was intended to be broad. One need look no further than Sprint's own arguments to appreciate this point. Recognizing that Section 38.4 contains no terms that, either on their face or inferentially, support the notion that Sprint had the option of paying access charges on VoIP traffic, Sprint directs the Court to divine such an option from other provisions of the ICAs. Sprint, for example, cites a paragraph in the ICAs' Preamble which reads:

> WHEREAS, the Parties intend the rates, terms and conditions of this Agreement, and their performance of obligations thereunder, to

> comply with the Communications Act of
> 1934, . . . the Rules and Regulations of the
> Federal Communications Commission . . . ,
> and the orders, rules, and regulations of
> the Commission.

Pl. Ex. 25 (Preamble). Sprint further cites Section 4.2, stating, "The Parties acknowledge that the respective rights and obligations of each Party as set forth in this Agreement are based on the texts of the Act and the orders, rules, and regulations promulgated thereunder by the FCC and the Commission . . . ." Id. § 4.2. Finally, Sprint offers Section 38.2, which relates to access charges generally: "Compensation for the termination of toll traffic and its origination of 800 traffic between the interconnecting parties shall be based on the applicable access charges in accordance with FCC and Commission Rules and Regulations . . . ." Id. § 38.2. As to Section 38.2, Sprint argues that it was meant to work in conjunction with Section 38.4 such that Section 38.4 only imposed an obligation to pay access charges as was required by law for VoIP traffic. And, it appears that Sprint also intends to say that the quoted portions of the ICAs' Preamble and Section 4.2 worked to similar effect, creating an obligation only insofar as the law required.

Those arguments do little to advance Sprint's position, however. Recall that, absent ambiguity, the ICAs' language is the Court's first and only inquiry. And nothing in the text of

Section 38.2—or, for that matter, the Preamble or Section 4.2—directs that Section 38.4 be modified in the manner advocated by Sprint. Sprint, in effect, asks the Court to read the word "shall," which conveys a clear command, out of Section 38.4 on account of language in other provisions of the ICAs, two of which do not even pertain to access charges. The Court declines that invitation, for it would be a bizarre path to modify the provision most on point with general language in peripheral, if not irrelevant, provisions. It also merits noting that, even if the above sections worked in conjunction with Section 38.4, they would not modify it in the way contemplated by Sprint. At most, the Preamble and Section 4.2's references to federal rules and regulations state the obvious, that the ICAs, and the parties' resulting obligations, are to comply in every respect with federal law. The same is true of Section 38.2. The most plausible interpretation of that section's reference to "FCC and Commission Rules and Regulations" is that, whatever access charges were to be billed, they were to comport with federal law on the subject. These references to federal rules and regulations on which Sprint relies, in other words, do not operate to relieve Sprint from all duties not imposed by federal law.

To appreciaqte the frailty of Sprint's argument one need only take it to its illogical conclusion. Sprint's contention,

in short, is that the ICAs' repeated statements that the agreements were to operate within the boundaries of federal law meant that Sprint's obligations under the ICAs' extended only to the requirements of federal law. This outcome should be resisted for the singular reason that it obviates the parties' need for the ICAs. What purpose would the ICAs, and Section 38.4, in particular, serve in the realm of VoIP traffic if Sprint's argument were to prevail? The answer is none. The Court refuses to embrace an interpretation of a contract that would render irrelevant its material terms.

Viewed as part of the whole, the language in the ICAs referencing federal law, in which Sprint vests so much significance, constitutes nothing more than boilerplate language with little, if any, substantive import. It is axiomatic that contracts are void to the extent that they impose duties inconsistent with the law. See, e.g., Shuttleworth, Ruloff and Giordano, P.C. v. Nutter, 493 S.E.2d 364, 366 (Va. 1997); Cohen v. Mayflower Corp., 86 S.E.2d 860, 864 (Va. 1955); Wallihan v. Hughes, 82 S.E.2d 553, 558 (Va. 1954). This argument made by Sprint would transform the ICA's innocuous references to federal law into text that renders Section 38.4, and, indeed the ICAs as a whole, meaningless. The ICAs' requirements that the parties comply with federal law in one area or another certainly do not

eviscerate clearly stated obligations established in other provisions of the ICAs.

The topic of the asserted breadth of Section 38.4 cannot be left without remarking on the testimony of the witnesses on which that notion (and the related notion of deliberate ambiguity) depends.[9] Central to Sprint's contention that Section 38.4 was drafted broadly or ambiguously so as to permit Sprint flexibility in paying access charges for VoIP traffic was the testimony of Janette Luehring, a Sprint in-house attorney. At trial, she testified that she had authored Section 38.4, the ICAs' VoIP Compensation Provision, and that she intended it to be "written broadly" or "ambiguously." Trial Tr. 816:22-818:22 (Luehring). On cross-examination, however, it came out that less than two months earlier at her deposition Ms. Luehring could not even remember who had authored Section 38.4. Id. at 848:2-849:5. Supposedly, two emails with which she was later presented helped to refresh her memory on the subject such that, by trial, she could clearly remember not only writing Section 38.4, the key provision in this contract dispute, but also writing it to be deliberately broad or ambiguous so that Sprint

---

[9] The Court considers such testimony aware that parole evidence regarding the parties' intent is superfluous given the Court's determination that Section 38.4 is unambiguous on its face. The witnesses' testimony is nevertheless worth examining because it further illustrates the baseless nature of Sprint's assault on the plain meaning of Section 38.4.

could avoid paying the charge governed by the section if it so desired. See id. at 848:14-22. That revision is not supported by the emails which Luehring says prompted her recollection. The emails, from Ms. Luehring to Jim Burt, dated September 19, 2003, merely state the language that became Section 38.4. See generally Pl. Exs. 5-6. They do not contain language suggesting that Ms. Luerhing, or anyone else in Sprint, intended Section 38.4 to be broad or ambiguous.

Further undermining her testimony, Ms. Luehring conceded that she had never conveyed to any of her corporate clients (neither Sprint nor the once-affiliate Plaintiffs) that Section 38.4 was broad or ambiguous, notwithstanding her own recognition that she might have had an obligation to do so under principles of ethics and/or federal securities law. Trial Tr. 865:15-869:23. Ms. Luehring's demeanor while testifying also undercut her veracity. When pressed by opposing counsel on the crucial issues in this action, she was unresponsive and evasive. Simply put, on the record as a whole, Ms. Luehring's testimony is not credible.

Sadly, the testimony of other Sprint witnesses is no more trustworthy. Jim Burt, who, it may be recalled, is Sprint's current Director of Policy, said that the written testimony submitted to the Florida Public Service Commission in 2004 (in which he stated that a VoIP provision identical to Section 38.4

42

required payment of access charges according to "the jurisdictionally appropriate inter-carrier compensation rates"), Pl. Ex. 16 at 7:13-18, had no bearing on Sprint's understanding of the ICAs presently in dispute, see Trial Tr. 941:19-942:14 (Burt). That claim defies credibility. Moreover, the testimony of James Sichter, Mr. Burt's former boss, recounted a significantly different story. Mr. Sichter made clear that, pursuant to the One Sprint Policy, Sprint took the singular position that access charges were due and payable on VoIP-originated traffic in the manner set out in Section 38.4. Mr. Burt would not have been allowed to advocate a contrary position before the Florida Public Service Commission. Id. at 324:15-326:15 (Sichter). Hence, to the extent that Mr. Burt characterized his testimony in Florida as an isolated occurrence, wholly dependent on the context of that individual proceeding, he misled the Court. Had Mr. Burt been forthright, he would have conceded that the position he articulated to the Florida Public Service Commission was consistent with Sprint's company-wide position on VoIP access charges. He also would have conceded that Sprint did not understand Section 38.4 to be ambiguous when it was written. Sprint knew then, as it does now, that Section 38.4 requires payment of access charges for VoIP-originated traffic according to the jurisdictional endpoints of calls.

Joseph Cowin, a senior Sprint in-house attorney, was similarly misleading. When presented with Mr. Burt's 2004 testimony before the Florida Public Service Commission, attesting that Sprint believed access charges to be due and payable on VoIP-originated traffic in the same manner required by Section 38.4, Mr. Cowin denied the accuracy of Mr. Burt's statement. Dep. Tr. 19:11-16 (Cowin). When pressed to explain his answer, Mr. Cowin expressed that he did not understand Mr. Burt's use of the word "believe." Id. at 20:10-21:4. Apparently, for him, that word has some definition that escapes basic understanding. When further pressed, Mr. Cowin pled ignorance, stating that he really knew nothing about the particulars of the proceedings before the Florida regulatory commission. Id. at 21:21-22:2.

Third, and in a parting attempt to change the meaning of Section 38.4 to something other than what that provision says, Sprint argues that, in 2004 and 2005 when the ICAs were executed, it would not have given its competitors better terms on VoIP compensation than it gave the then-affiliate, and now Plaintiff, local telephone carriers. Toward this point, Sprint notes that it signed ICAs with non-affiliate competitors of Sprint explicitly recognizing that the applicability of access charges on VoIP-originated traffic was an unsettled issue. See Pl. Ex. 10 § 37.3 (agreement between Sprint and Level 3

44

Communications LLP) ("The Parties further agree that this Agreement shall not be construed against either party as a 'meeting of the minds' that VoIP traffic is or is not local traffic subject to reciprocal compensation in lieu of intrastate or interstate access."); Pl. Ex. 11 § 4.4 (similar agreement between Sprint and MCI). Sprint contends that it would not have done this had the ICAs entered into with the then-affiliate Plaintiffs not also worked to the same effect, stopping short of imposing a requirement to pay access charges for VoIP traffic. In this way, Sprint invites the Court to read into Section 38.4 the notion that Sprint had an option, rather than an obligation, to pay access charges on VoIP-originated traffic.

Sprint's third argument falls flat because the record does not establish that the ICAs noted above would have given Sprint's competitors more favorable contract terms. Sprint assumes that its non-affiliate competitors stood to benefit by terms that did not lock parties into paying access charges for VoIP traffic. This may have been the case. But, it is equally plausible, in the absence of evidence to the contrary, that Sprint's competitors stood to lose by such terms. Sprint's competitors, for example, might have been in a position to collect more access charges from Sprint than they paid Sprint in return for termination of their customers' traffic. Such a scenario would have made contractual language facilitating

disputation of access charges a hindrance rather than a boon for them. This same point can be made from the perspective of the Plaintiffs. Section 38.4's language, obligating payment of access charges, might have been advantageous to the Plaintiffs if they were positioned to collect more access charges than they were to pay out. Because these possibilities are unaccounted for in the evidence, the accuracy of Sprint's claim that contractual language leaving open the issue of VoIP access charge benefited its competitors is tenuous at best. And, with this proposition in question, Sprint's entire argument—that Section 38.4 should be read to mirror its other agreements with non-affiliate competitors, lest the Court conclude that Sprint gave better terms to non-affiliates—rests on an unstable foundation.

If these other ICAs prove anything, it is that Sprint certainly knew how to draft a VoIP provision that stopped short of obligating the parties to pay access charges on VoIP-originated traffic, and the company made a conscious decision not to include such language in the ICAs entered into with the Plaintiffs. The VoIP provision in the ICA that Sprint executed with Level 3 Communications Company LLC is illustrative.[10]  See Pl. Ex. 10 § 37.3. This ICA was agreed to in March 2004, before

---

[10] Though illustrative, this ICA is not exhaustive of instances in which Sprint agreed to disagree on VoIP compensation. See, e.g., Pl. Ex. 11 § 4.4; see also Trial Tr. 863:9-11 (Luehring).

the effective dates of any of the ICAs involved in this action. Trial Tr. 863:10-13 (Luehring). Its VoIP provision, Section 37.3, departs markedly from Section 38.4. Section 37.3, for instance, begins, "Neither Party will knowingly send voice calls that are transmitted by a Party or for a Party at that Party's request . . . via the public Internet or a private IP network over local interconnection trunks for termination as local traffic until a mutually agreed Amendment is effective." Pl. Ex. 10 § 37.3. It also states, "The Parties further agree that this Agreement shall not be construed against either Party as a 'meeting of the minds' that VOIP traffic is or is not local traffic subject to reciprocal compensation in lieu of intrastate or interstate access." Id.

That Sprint agreed to an ICA containing such verbiage, before it negotiated the ICAs in this dispute, demonstrates convincingly that Sprint well knew how to draft language "agreeing not to agree" on VoIP compensation when the ICAs with the Plaintiffs were executed. Furthermore, that such verbiage is absent from the ICAs here at issue, Trial Tr. 864:1-6 (Luehring), is strong evidence that Sprint did not intend to leave the issue of VoIP compensation unresolved with the Plaintiffs. Thus, in sum, the antecedent ICAs that Sprint signed with its competitors, such as the one executed with Level 3, rather than counseling for reading language into Section

38.4, counsel for reading Section 38.4 just as it is written, to require compensation for the termination of VoIP-originated traffic.

### E. Section 38.4 Means What It Says

If there is a common thread to Sprint's arguments, it is obfuscation. Sprint attempts to steer this action away from the basic contract principles on which it is properly to be decided and toward issues that, to put it charitably, are extraneous. Sprint's conduct cannot be explained by novel interpretations of the ICAs or subtleties pertaining to the parties' purportedly unique relationship, as Sprint would have this Court believe. These explanations represent nothing more than smoke and mirrors, proffered to conceal the straightforward nature of this contract dispute. The record does not reveal a company that carefully drafted the ICAs' VoIP Compensation Provision—Section 38.4—to permit Sprint flexibility to compensate the Plaintiffs as it saw fit. The record reveals, instead, a company that, years after signing the ICAs and performing them as written, has attempted to graft onto them an interpretation that helps its cost-cutting initiatives. The bottom line is that Section 38.4 means what it says: VoIP traffic shall be compensated in the same manner as voice traffic, meaning intrastate and interstate access charges where appropriate.

## 2. Sprint Breached Its Obligation To The Plaintiffs

There being no doubt that Section 38.4 of the ICA—and, by extension, the VoIP compensation provisions of the other ICAs—require payment of access charges for VoIP-originated traffic according to the jurisdictional endpoints of calls, the only question remaining is whether Sprint breached its contractual mandate.[11]  Clearly it did.  By refusing to pay the Plaintiffs' access charges as billed, Sprint violated the terms of the ICAs. By incorporating the Plaintiffs' tariffs, the ICAs plainly establish interconnection rates higher than the $.0007 per-minute rate Sprint now offers the Plaintiffs.

## CONCLUSION

For the reasons set forth above, judgment will be entered for the Plaintiffs for compensatory damages and late charges in stipulated amounts or pursuant to decision based on briefs to be filed as required by the Order entered on February 18, 2011; prejudgment interest in an amount to be determined by the Court upon submission of briefs or agreement as to the appropriate rate and the actual calculation of the prejudgment amount; and for post-judgment interest at the federal judgment rate or other rate, if applicable, after submission of briefs or agreements as to the applicable post judgment rate; and for reasonable

---

[11] The issue of damages was resolved by stipulation of the parties.  See introduction to "LEGAL DISCUSSION," supra.

attorneys' fees, if any be awardable, in an amount to be determined by the Court upon submission of briefs and evidence.

It is so ORDERED.

_____/s/_____ *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March __/__, 2011