IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CENTRAL TELEPHONE CO.
OF VIRGINIA, et al.,

    Plaintiffs,

v.                        Civil Action No. 3:09cv720

SPRINT COMMUNICATIONS CO.
OF VIRGINIA, INC., et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on CENTURYLINK'S MOTION FOR DIVESTITURE OR, IN THE ALTERNATIVE, FOR RECUSAL WITHOUT VACATUR (Docket No. 200).  For the reasons set forth below, the motion will be granted.[1]

## STATEMENT OF FACTS

This action commenced on November 16, 2009, when the CenturyLink Plaintiffs (collectively, "CenturyLink") filed suit

---

[1]  CenturyLink requested that the presiding judge divest himself of his interest and to continue to preside over the case.  With respect to the request that the presiding judge continue to preside, the motion will be granted.  To the extent that the motion seeks divestiture, it will be denied as moot because divestiture occurred on May 17, 2011.  In its motion, CenturyLink also asked the Court not to vacate its earlier decisions if it decided recusal was necessary.  Because this Court has determined that recusal is not necessary, there is no need to consider the issue of vacatur.

against the Sprint Defendants (collectively, "Sprint") alleging breach of contract.[2]  See COMPLAINT (Docket No. 1).  On January 25, 2010, Sprint filed a counterclaim for breach of contract against CenturyLink.  See JOINT ANSWER TO PLAINTIFFS' COMPLAINT AND COUNTERCLAIM (Docket No. 26); DEFENDANTS' FIRST AMENDED COUNTERCLAIM (Docket No. 95).  During the intervening year and a half, the Court severed the trial of the two breach of contract claims, see ORDER (Docket No. 93); issued an opinion denying a motion by Sprint challenging the existence of subject matter jurisdiction, see MEMORANDUM OPINION (Docket No. 169); conducted a six day bench trial on CenturyLink's claim and, after post-trial briefing, issued an opinion entering judgment for CenturyLink on its breach of contract claim, see MEMORANDUM OPINION (Docket No. 180); issued an opinion granting CenturyLink's request for prejudgment interest, but denying its request for attorney's fees, see MEMORANDUM OPINION (Docket No. 185); conducted a two day bench trial on Sprint's breach of contract claim, and, thereafter drafted an opinion resolving Sprint's counterclaim.  During this same period, the Court held numerous conference calls and in-court hearings with the parties.

---

[2] The nature of CenturyLink's breach of contract claim is set forth in detail in a MEMORANDUM OPINION (Docket No. 180) at 3-17.

On May 10, 2011, at a time when the preparation of the opinion on Sprint's counterclaim was underway and when the presiding judge was preparing the annual financial disclosure statement required of federal judges, the presiding judge became aware that, at all times during which he had presided over this action, he owned stock in CenturyLink.   The specifics of the stock ownership and its discovery are set forth in a statement filed on May 31, 2011.   See INFORMATION STATEMENT (Docket No. 206).

To summarize that statement, on May 10, 2011, the presiding judge owned 80 shares of CenturyLink, which were held in a managed Individual Retirement Account ("IRA") with Morgan Stanley Smith Barney.   Decisions to buy and sell the stocks in the IRA were made by the fund managers without input from the presiding judge.[3]   At any given time, this particular IRA held positions in as many as 200 companies.[4]   The CenturyLink shares were first purchased in 2005 as shares in a company known as

---

[3] If the fund manager bought a stock in a company that was a party to a case being handled by the presiding, the presiding judge was permitted to instruct the manager to sell that stock and the parties would be informed of the facts.   That scenario has occurred on a few occasions in the almost twenty years that the presiding judge has been on the bench.

[4] The statement estimated the number to be between 50 and 100 companies.   As shown by an exhibit to Sprint's Memorandum (Docket No. 208-2), the number actually was slightly more than 200 companies.

"Embarq."   After a merger in July of 2009, those shares were converted into 45 shares of "CenturyTel, Inc."   In 2009 and 2010, respectively, the IRA fund manager purchased 13 and 10 more shares of CenturyTel, Inc, bringing the total number of shares to 80.

The total value of the CenturyTel shares did not exceed $3,800 during the pendency of this action.   Between November 2009 and May 2011, the holding in CenturyLink represented from 0.52% to 0.81% of the value of the IRA in which the shares were held.   In the same time frame, the holding in CenturyLink represented from 0.39% to 0.61% of the combined value of both IRA's held by the presiding judge.

As soon as the presiding judge realized that he owned the CenturyLink stock, he informed the parties of the situation during a conference call.   During the call, held on May 10, 2011, he made the following statements:

1.   "I was in the process of preparing my financial disclosure statement, which is due at the end of the year, and I realized that for sometime, including during the period of time when I have issued opinions in this case, I have owned stock in CenturyLink . . . And as a consequence, I am not qualified under the canons of ethics to sit as a judge in this case."

2.   "These are all managed IRAs and I don't have any control over who buys what from whom . . . if I had been handling this case for a good while and the[] [managers] buy this stock, then I can have the stock sold and

continue to handle the case.  But that isn't what happened here . . . So, I don't know that there's any alternative but for me to vacate the orders that I've entered in the case and recusing myself and having the case reassigned to some other judge to make a decision."

3.   "I don't expect you to say anything at this time.  So what I propose to do is to take the course I have outlined.  I think the only substantive decisions that I have entered are the decisions on jurisdiction, the decision on the judgments, the opinion on the merits."

4.   "What I'll do is put it back in for reassignment to some judge in accord with the standard assignment system.  So, as I said, I don't expect you-all to say anything, but if you have any questions, I'll be glad to try to answer them at this time."

Thereafter, counsel for CenturyLink asked to be given time to research the recusal and vacatur issues before any action was taken.  Counsel for Sprint voiced no objection, expressly leaving the decision to the presiding judge.  CenturyLink was given one week to research the issues and, if desired, to file a brief and/or motion based on its research. On May 16, 2011, CenturyLink filed the motion now under consideration.

Before CenturyLink filed its motion, additional research was undertaken in chambers in the days following the May 10th conference call.  Having gained a new perspective from studying the caselaw and applicable canons more fully and upon reviewing CenturyLink's memorandum, the presiding judge came to the view

that his statements to counsel during the May 10th conference call may have rested on an erroneous understanding of the ethical rules. Thus, the parties were asked to agree on an equitable manner of briefing the motion,[5] which they did. Aware that the motion needed to be addressed, the presiding judge instructed the IRA fund manager to sell the 80 shares of CenturyLink. The manager accomplished this on May 17, 2011.

## DISCUSSION

CenturyLink's motion, and Sprint's responses, raise several issues. First, Sprint takes the view that the statements made by the Court at the beginning of the May 10th conference call constituted a recusal.[6] Second, Sprint posits that, under a 1971 resolution of the Judicial Conference of the United States, it was not appropriate for the Court to have allowed briefing on the issues of recusal and vacatur.[7] Third, Sprint says that, under 28 U.S.C. § 455(a), recusal and vacatur are required. Fourth, Sprint submits that, under 28 U.S.C. § 455(b), recusal

---

[5] The Court offered Sprint, the non-moving party, the opportunity of filing a sur-reply, which Sprint accepted. See NOTICE OF CONSENT ORDER REGARDING BRIEFING SCHEDULE (Docket No. 204).

[6] MEMORANDUM REGARDING JUDGE'S ANNOUNCED INTENT TO VACATE ORDERS AND RECUSE HIMSELF, AND IN OPPOSITION TO CENTURYLINK'S MOTION FOR DIVESTITURE OR, IN THE ALTERNATIVE, FOR RECUSAL WITHOUT VACATUR (Docket No. 208) ("Sprint Response") at 4-6.

[7] Id. at 2-4.

and vacatur are required.    Each issue will be considered in turn.

1.    **The Effect Of The May 10th Conference Call**

On May 10, while preparing the annual financial disclosure statement for federal judges, the presiding judge realized that he owned 80 shares of CenturyLink stock and had owned these shares since before the filing of this action.    Shortly after the discovery, counsel were convened by conference call and the facts were made known to them.    It is fair to say that, in that telephone conference, the presiding judge expressed the views that:    (1) recusal appeared to be the appropriate course to take; (2) vacatur of the previous findings on jurisdiction and the findings of fact, conclusions of law, and judgment in favor of CenturyLink appeared also to be appropriate; and (3) recusal would mean that the case would be reassigned.

After those observations were stated, counsel for CenturyLink requested that no decision respecting recusal or vacatur be made until after counsel could research the issues. Counsel for Sprint did not object.    The request by counsel for CenturyLink was granted, and a week later counsel filed the pending motion.

On this record, it cannot be said that Sprint is correct in its position that the statements made by the presiding judge in the May 10th telephone conference constituted recusal.    The

conversation reflects the Court's view that recusal, vacatur and reassignment appeared to be appropriate, immediately after which a party's counsel asked for time to research the issues and, if appropriate, to be heard on them.  The case was not reassigned.  No recusal order was entered, and the conference call ended with the recognized possibility that recusal might not be appropriate.  Thus, contrary to Sprint's contention, recusal has not occurred.  Instead, the matter was set for briefing.

But, even if Sprint were correct in describing the conversation as an articulation of recusal, that would not resolve the matter.  The Second and Third Circuits have found that a judge who explicitly recuses himself can change his mind after considering arguments from both parties concerning his recusal, and the Compendium of the Judicial Conference's Advisory Committee explicitly encourages continued participation in situations where the judge discovers "that recusal was unnecessary and should not have occurred."  See United States v. Lauersen, 348 F.3d 329, 338 (2d Cir. 2003); United States v. Dalfonso, 707 F.2d 757, 759 (3d Cir. 1983)); Compendium, § 3.8-2[1][b].

In Lauersen, a judge told the parties he would recuse himself unless both parties agreed to waive objections to his continued participation, but after allowing the parties to submit briefing and argument, he changed his mind and decided

not to recuse himself.   348 F.3d at 333-34 (2d Cir. 2003).   The
Second Circuit held that the judge's recusal was not mandated by
his initial announcement.   Id. at 338 ("There is no reason to
prohibit a judge from reconsidering a recusal decision, at least
in the absence of transfer of the case to another judge.")
(citations omitted).   In Dalfonso, a judge actually had entered
a recusal order and then, after consultation with both parties,
decided to vacate the order.   707 F.2d at 759 (3d Cir. 1983).
The Third Circuit upheld the decision to continue participation
in the case.

Here, no order of recusal was entered and the case was not
reassigned.   After the presiding judge expressed the view that
the applicable law appeared to require recusal and vacatur,
counsel for a party requested an opportunity to bring the issues
and that request was granted.   Considering the record as a
whole, it cannot be said that recusal occurred.

## 2.   The Propriety of Allowing Briefing On The Issues Of Recusal And Vacatur?

Sprint next argues that it is not appropriate for the Court
to allow and consider briefing on the recusal issue.   Sprint's
position is based on the report of the Proceedings of the
Judicial Conference of the United States, October 28-29, 1971,
at 68-69 which states that: "[A] federal judge should reach his
own determination as to whether he should recuse himself from a

9

particular case, without calling upon counsel to express their views as to the desirability of his remaining in the case."

That instruction admonishes judges not to solicit briefing. Here, briefing was not solicited. To the contrary, a party requested briefing and the request was granted.

The Judicial Conference report did not address the situation in which a party asks to submit briefing on its own volition. However, the Seventh Circuit has considered the question and determined that the Conference's instruction prohibits only the solicitation of views on the desirability of recusal. Thus, Judge Easterbrook upheld a federal district judge's request that counsel inform him about the issues he should consider in determining whether recusal was appropriate. In re Nat'l Union Fire Ins. Co., 839 F.2d 1226, 1231 (7th Cir. 1988). He noted that the judge did not ask the parties to "approve" or "disapprove" of his continued participation in the case. Id. He explained that, "the best practice [in handling recusal and vacatur] is to disclose the details that the judge deems significant, to make a decision by one's own lights, and let counsel speak or keep silence as they will." Id. Finally, he emphasized that violations of the Conference's advice were not in and of themselves grounds for disqualification. Id.[8]

---

[8] It is not unusual for federal judges to allow parties to brief vacatur and recusal issues. See, e.g., Union Carbide Corp. v.

Here, briefing was not solicited from the parties during the conference call.   Instead, the presiding judge informed counsel of the financial interest, expressed his views of what appeared to be appropriate and "let counsel speak or keep silent as they w[ould]" stating, "I don't expect you-all to say anything, but if you have any questions, I'll be glad to answer them at this time."   Transcript of May 10, 2011, Conference Call (Docket No. 202) 5:18-21.   Counsel for CenturyLink spoke and asked for time to research and brief the issues of recusal and vacatur.   Sprint was asked whether it had an objection to such briefing.   Sprint's counsel also spoke, explicitly leaving the decision to the presiding judge.   The May 10th call was concluded with the following instruction to CenturyLink: "Whatever you're going to file, if you're going to file anything, file it in a week."

---

U.S. Cutting Serv., Inc., 782 F.2d 710, 713, 716 (7th Cir. 1986) (upholding a district judge's decision, made after consideration of parties' briefs on divestment, that recusal was not required); United States v. Lauersen, 348 F.3d 329, 333, 338 (2nd Cir. 2003)(upholding a judge's decision not to recuse himself, even after that judge solicited and considered briefings and "motions for disqualification" from the parties on the issue of recusal).   Key Pharmaceuticals, Inc. v. Mylan Laboratories, Inc., 24 F. Supp. 2d 480 (W.D. Pa. 1998) (finding that recusal was unnecessary after holding "a conference with counsel to explain [his financial interest] and to give all parties and the court the opportunity to study the question of how to address this situation under 28 U.S.C. § 455 and relevant ethical rules").

Where, as here, the parties have invested such extensive time and resources into a case, one judgment on the merits has been entered, and another claim has been tried on its merits, it would be unfair, and a likely denial of due process, to refuse a party's request to brief issues, the resolution of which has such serious consequences. The instruction of the Judicial Conference cannot reasonably be interpreted to mean that a court should deny briefing on a recusal issue if a party requests it.

## 3. Section 455

### A. Section 455(b)

The statute requires disqualification in a matter if the judge "knows that, he individually or as a fiduciary . . . has a financial interest in . . . a party to the proceeding." 28 U.S.C. § 455(b)(4). The plain language of the statute requires actual knowledge of the financial interest.

That understanding of § 455(b)(4) is confirmed by the decision of the Supreme Court in Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988) in which the Court explained that scienter is not required by § 455(a), but is required by § 455(b)(4). Id. at 859. That understanding seems now to be beyond dispute. See, e.g., Chase Manhattan Bank, 343 F.3d 120, 127 (2nd Cir. 2003)(explaining § 455(b)(4)'s "actual knowledge" test and finding that despite the fact that the presiding judge admitted having seen media articles about a

company merger that should have alerted him to a conflict, and despite the judge's numerous references to the name of the newly merged company, and the testimony of witnesses about the merger, the judge did not actually "know" that the newly merged company was a party in his case); United States v. Pappert, 1 F. App'x. 767 (10th Cir. 2001) (unpublished table opinion)(explaining the "actual knowledge" standard); Davis v. Xerox, 811 F.2d 1293, 1294, 1295 (9th Cir. 1987)(explaining that "actual knowledge" is required under § 455(b)(4) and accepting a judge's account that, after several years of litigation, he had recently "recalled" his ownership of a warrant in a company related to one of the parties); see also NEC Corp. v. Intel Corp., 654 F. Supp. 1256, 1258 (N.D. Ca. 1987), vacated as moot, 835 F.2d 1546 (9th Cir. 1988) (explaining that § 455(b)(4) requires "conscious awareness"); Health Servs. Acquisition Corp. v. Liljeberg, 796 F.2d 796, 801-02 (5th Cir. 1986), aff'd by Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 859 (1988)(same); Union Carbide Corp. v. U.S. Cutting Serv., Inc., 782 F.2d 710, 713-14 (7th Cir. 1986)(same).

Sprint does not argue otherwise. Instead, Sprint argues that the actual knowledge standard is satisfied. Def. Mem. Regarding Vacatur and Recusal at 22 (Docket No. 208); Def. Reply Mem. Regarding Vactur and Recusal at 2-3 (Docket No. 210). The

pertinent facts respecting Sprint's arguments are not complicated.

According to the fund manager, the IRA held a total of 45 shares of Embarq Corp. on July 1, 2009 which, as a result of a merger, became 47 shares of CenturyTel, Inc. Thereafter, on October 16, 2009 and March 9, 2010, the fund manager purchased 13 and 20 additional shares, respectively. On June 1, 2010 the name was changed to CenturyLink, Inc.

This action was filed on November 16, 2009. At the time, the shares were named CenturyTel, Inc. The Financial Disclosure Statement filed by the undersigned on July 30, 2010 reflected that the IRA held shares of CenturyTel, Inc. CenturyTel, Inc. was not named as a party in the Complaint which listed 19 companies as plaintiffs. The Complaint used the term "CenturyLink" to describe the plaintiffs, and in paragraph 7 of the 72 paragraph Complaint, CenturyTel, Inc. was described as the parent company of the so-called "CenturyLink" plaintiffs. The STATEMENT OF DISCLOSURE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 7.1 (Docket No. 4) filed by the plaintiffs described in short form the plaintiff companies as "CenturyLink Plaintiffs" and recited that they were owned by CenturyTel, Inc.

Because CenturyTel, Inc. did not appear in the style of the case, the computerized conflict checking system used by the

Court did not identify a conflict. Nor did the presiding judge's own review.

Monthly in each year, including 2009 and 2010, the presiding judge received statements from the fund manager that reflected the ownership of CenturyTel, Inc. in 2009 and 2010 and of CenturyLink, Inc. after the name change in June 2010.

Quite clearly, from the time this action was filed, the presiding judge was in the possession of information from which the existence of a conflict could have been actually known. But, the simple fact is that the conflict was not identified or known until May 10, 2011 when the presiding judge was completing the Financial Disclosure Statement that was filed on May 31, 2011.

These facts are said by Sprint to be sufficient to establish that the presiding judge actually knew of the disqualifying financial interest. The word "know" is given no definition by the statute. Thus, it should be given its usual and accepted meaning. Perrin v. U.S. 444 U.S. 37, 42-43 (1979). When used as a verb,. The word "know" means "to perceive . . . to recognize, to identify." Home Oxford Dictionary (2011); or "(1) [t]o perceive directly; have direct cognition of; (2) to have understanding of . . . (3) to recognize the nature of; or to be aware of the truth or factuality of; be convinced or certain of." Merriam-Webster

<u>Online Dictionary</u> (2011).  Or, as the Supreme Court explained in <u>Lilejberg</u>, the word "know" in § 455(b)(4) means actual knowledge.

The arguments made by Sprint are pertinent to the issue of constructive knowledge, but they do not evince actual knowledge and that is the level of scienter required by § 455(b)(4).  For the foregoing reasons, § 455(b)(4) does not call for recusal.

**B.   Section 455(a)**

Section 455(a) provides that: "any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality may reasonably be questioned."   Before it was amended in 1974, § 455(a) only required a judge to disqualify himself "in any case in which he ha[d] a substantial interest."   Congress amended § 455(a) in order to promote "public confidence" in the judiciary and make "the statutory grounds for disqualification of a judge . . . conform generally with the . . . canon of the Code of Judicial Conduct."   H.R. Rep. No. 93-1453 (Oct. 9, 1974).

**1.   The Standard To Be Applied**

In <u>Liljeberg</u>, the Supreme Court affirmed the Fifth Circuit's "construction of § 455(a)," finding that a violation of the statute "is established when a reasonable person, knowing the relevant facts, would expect that a justice, judge, or

magistrate knew of circumstances creating an appearance of partiality." Liljeberg, 486 U.S. at 850. Thus, § 455(a) applies to those situations where a "reasonable person" would believe that the judge actually knew about the disqualifying interest at issue.[9]

"The determination of whether such an appearance has been created is an objective one based on what a reasonable person knowing all the facts would conclude." Chase Manhattan, 343 F.3d 127 (citing Liljeberg, 486 U.S. at 860-61). And, it should be assumed that a reasonable person not only knows all the relevant facts, but also understands them. See Pepsico, Inc. v. McMillen, 764 F.2d 458, 460 (7th Cir. 1985). In weighing recusal, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be trying to avoid the adverse consequences of his presiding over the action. See In re United States, 666 F.2d 690, 695 (1st Cir. 1981).

---

[9] See also Chase Manhattan Bank v. Affiliated FM Ins. Co., 343 F.3d 120, 132 (2d Cir. 2003)(examining whether "a reasonable person would believe that the district judge knew he had a financial interest in a party to the litigation at some point before the decision on the merits" to determine whether there was a violation of § 455(a)); Davis v. Xerox, 811 F.2d 1293, 1296 (9th Cir. 1987)("[I]f a reasonable person would conclude from all the circumstances that the judge did not have knowledge at the time he sat, his rulings stand.").

In <u>Chase Manhattan</u>, the Second Circuit had occasion to address § 455(a) within the specific context of a judge's uncovering a financial interest in a party during the course of litigation.  There, the court held:

> that an appearance of partiality requiring disqualification under Section 455(a) results when the circumstances are such that: (i) a reasonable person, knowing all the facts, would conclude that the judge has a disqualifying interest in a party under Section 455(b)(4), and (ii) such a person would also conclude that the judge knew of that interest yet heard the case.

<u>Chase Manhattan</u>, 343 F.3d at 128.  The Court noted that the [broader] goal of section 455(a) is to avoid even the appearance of impartiality."  <u>Id.</u> (citation and quotation marks omitted), but also cautioned, however, that "the appearance rule [cannot be] so unforgiving of all honest mistakes as to cause it to swallow up the knowledge requirement of Section 455(b)(4)."  <u>Id.</u> at 129.

### 2.   Application Of The Standard To The Facts

Because the financial interest is the genesis of the alleged conflict, it is the nature and context of that interest that would be of central importance to ascertaining a reasonable person's perception of the presiding judge's impartiality.  The context of the financial interest here begins with the fact that the shares at issue were held in a managed IRA.  The fund manager, without input from the presiding judge, made the

decisions whether to buy or sell shares in the account and when to buy or sell them.   The stock at issue was one of approximately two hundred stocks in the account and, during the time at issue, the peak value of the shares was $3,800.   The holding in CenturyLink represented from 0.52% to 0.81% of the value of that IRA in 2009, 2010 and 2011, respectively.   And, it represented from 0.39% to 0.61% of the value of the undersigned's two IRA's during that time frame.   Thus, a reasonable person with knowledge of all the facts would understand that the financial interest here was quite small, if not trivial and that it also was a very small component of the presiding judge's stock holdings.

A reasonable person also would want to understand the extent to which a decision in favor of CenturyLink would inure to the benefit of the presiding judge.   The record made in the recusal briefing shows that, during the pendency of the case, the average number of outstanding CenturyLink shares was more than 300 million, 80 of which were held in the IRA.   The award to CenturyLink was $23,376,213.76 in contract damages and interest.   PARTIAL FINAL JUDGMENT ORDER (Docket No. 187, as amended by Docket No. 190).   Thus, the judgment would be

understood to have increased the value of the presiding judge's holding by $6.00.[10]

A reasonable person also would also take note of the fact that the presiding judge, and not either one of the parties, brought his financial interest to the parties' attention, just after he discovered the ownership. The presiding judge scheduled a telephone conference with the parties as soon as he discovered the interest and went on the record to explain that he was unaware that he owned the shares at issue. And, a reasonable person would understand that it would be unlikely for a judge, who has all along known about his ownership of disqualifying stock, to suddenly bring that ownership to the parties' attention after devoting many weeks of his time to deciding a complex jurisdictional motion, to resolving summary judgment motions, to presiding over two trial sessions, and to preparing findings of fact and conclusions of law.

Finally, a reasonable person might ask whether a judge would run the risk of impeachment or perhaps prosecution for knowingly deciding a case from which he knew he should have

---

[10] The Court has discretion to take judicial notice of public stock prices and other public information related thereto. See Greenhouse v. MCG Capital Group, 392 F.3d 650, 655 n.4 (stating "[w]e note that we, as well as the district court, may take judicial notice of published stock prices without converting a motion to dismiss into a motion for summary judgment").
The $6.00 figure represents $23,376,213.76, divided by 300 million shares, multiplied by 80 shares.

recused himself.  It seems unlikely that a reasonable person would come to the view that a judge would take such a course.

In sum, it is hard to come to the conclusion that a reasonable person armed with all the facts would expect that the presiding judge "knew of circumstances creating an appearance of impartiality" while presiding over the case.  Liljeberg, 486 U.S. at 850.  Thus, § 455(a) does not call for recusal here.

Sprint thinks that Lilejberg and Chase Manhattan necessitate the opposite conclusion.  However, the facts in those cases were quite different than those presented here.

In Liljeberg, the Supreme Court found that a reasonable, objective observer would believe the judge knew about his interest before disqualification motions were filed.  486 U.S. 850 (1988).  In that case, the judge attended a board meeting a few days prior to the filing of the complaint in which a University's trustees discussed selling some of their land to the plaintiff.  Id. at 2201.  The meeting was one of many where the land-sale had been discussed.  Id. at 2205.  The judge was not present when the land was actually sold, but the trustees sent him letters disclosing the details of the sale.  Id. at 2201.  The judge eventually acquired actual knowledge of the sale and his conflict of interest by reading these letters, but he did not recuse himself or alert the parties to the conflict. Id.  The Supreme Court found it "remarkable" that the judge

claimed to have forgotten the numerous discussions of the land sale at board meetings before the start of the litigation and both "remarkable" and "inexcusable" that he did not recuse himself even after he acquired actual knowledge of the conflict. Id. at 2205-06. On these facts, it held that a reasonable, objective observer would believe the judge had actual knowledge before the motion for disqualification, and thus, that he had violated § 455(a). Id. at 2206.

And in Chase Manhattan Bank, the Second Circuit found that a reasonable, objective observer would believe that the judge had actual knowledge of his ownership of $250,000-$300,000 worth of stock in a plaintiff's company. 343 F.3d 120, 123 (2nd Cir. 2003). The stock was not held in the plaintiff's name as the result of a merger that had just taken place. Id. However, the merger was widely publicized, the judge received letters from officials from the new company (in which he held the stock) on that company's letterhead during litigation, witnesses at trial discussed the merger, and the judge's opinion containing his findings of fact referred to the newly merged company as a party. Id. Although the shares held by the judge represented less than 1% of his personal fortune, the Court concluded on these facts that a reasonable person would believe he knew he held stock in a plaintiff's company and yet heard the case. Id. at 128.

22

The facts presented in this action are not like those in Liljeberg or Chase Manhattan. Rather, the facts here are more analogous to those found in Key Pharmaceuticals Inc. v. Mylan Laboratories, Inc., 247 Supp.2d 480 (W.D. Pa. 1998) and Davis v. Xerox Corp., 811 F.2d 1293, 1296 (9th Cir. 1987).

In Davis, a judge realized that he had been receiving dividends in the amount of $30 a year from his investment in a defendant's company and that these dividends were not on his financial disclosure reports. Id. at 1294. He immediately alerted the parties and the Circuit's Judicial Ethics Committee. Id. On these facts, the Ninth Circuit found that the interest was so small and the judge's actions so sincere that a reasonable, objective observer would not find that he knew of his interest while making the decisions at issue. Id. at 1297.

In Key Pharmaceuticals, the court analyzed the substantiality of the judge's financial interest and the potential affect of the outcome of the case on a judge's financial interest. 24 F. Supp. 2d 480 (W.D. Pa. 1998). The court found that recusal was not required where the judge held 115 shares of plaintiff subsidiary's stock through his IRA account. Id. at 481. The Court noted that the judge's total holdings in the stock were worth $10,185.18, representing only a small fraction of his total portfolio and that "any potential

loss or gain related to the outcome of this case would be even smaller." Id. at 483.

Taken together, the decisions in Liljeberg, Chase Manhattan, Key Pharmaceuticals and Davis applied to the facts of this case counsel that recusal is not appropriate here. As is true in those cases, the presiding judge certainly erred. But, a reasonable person, knowing and understanding all the facts in this case, would not conclude that the presiding judge knew of a financial interest that would have precluded presiding over the case.

### 3. The Non-Financial Interest Factors Discussed By Sprint

Sprint also takes the view that an appearance of impropriety can be found in the facts that: (1) during the trial, the presiding judge several times prompted Sprint's counsel to hone their questions and move the proceeding along; and (2) in the Memorandum Opinion on CenturyLink's breach of contract claim, the presiding judge commented adversely on the credibility of some of Sprint's witnesses and on Sprint's theory of the case.

It is correct that Sprint's counsel were prompted to move the case along and to hone their questions. That, of course, must be considered in perspective of the fact that the case on CenturyLink's breach of contract claim was set for three days.

It ended up lasting six days, four of which were occupied by Sprint's defense.   The record will show that it was necessary from time to time to prompt Sprint's counsel to remain within the confines of that which was relevant and to avoid presentation of repetitive evidence.   That said, Sprint was afforded ample time to present its case.

It also is clear from the Memorandum Opinion that Sprint's theory of the case was rejected and that several of its witnesses were found to be lacking in credibility.   Where, as here, a judge sits without a jury, he must decide what theories to accept and what theories to reject.   And, to do that, he also must decide which testimony to credit and which to disbelieve. Further, a judge is obligated to make findings of fact and conclusions of law so that the decision can be reviewed on appeal.   That, in turn, requires the judge to give reasons for accepting one side's view of the case and rejecting the other side's position.   And, that also obligates the judge to explain which witnesses it believed and why.

Thus, Sprint's complaints about admonition to its counsel to move the case along and the specificity of the Court's findings on the validity of Sprint's case and the credibility of its witnesses lack merit.

### 4.   The Statute and Its Purpose: A Reprise

It also seems important to note that, in this case, recusal and vacatur would undermine the statutory purpose of § 455(a). The fundamental purpose of § 455(a) is "to promote public confidence in the integrity of the judicial process. . . ." Liljeberg, 486 U.S. at 859-60.   CenturyLink argues that the public confidence analysis must include the realities that both parties have devoted enormous resources to the preparation for, and presentation of proofs in, the two trials; and that they have incurred several millions of dollars in fees and expenses. Of course, it would not promote confidence in the integrity of the judicial process to set at naught the investments of the parties in a case unless it is necessary to do so because there really is an appearance of impropriety.   But, it would not serve the statutory purpose of § 455(a) to allow those realities to be the predominant component of analysis.   Thus, if there is an appearance of impropriety, the consequence must be that recusal must occur, along with whatever consequences that entails.

In this case, were the presiding judge to recuse himself or enter a vacatur order, where the nature of the interest he possessed was so innocuous and so small, where a judgment for either party could have only the most infinitesimal effect on the financial interest, and where no reasonable person would perceive that the judge knew of that interest when presiding

over the case, it would lead to confusion and to doubt as to whether any judicial decision can really be said to be certain. See, e.g., Parker v. Connors Steel Co., 855 F.2d 1510 (11th Cir. 1988)(noting the importance of promoting public confidence with respect to § 455(a) and finding vacatur unnecessary because overturning a case "without regard to the merits" would lead "the public [to] lose faith in our system of justice"). To take such action here would be to set at naught hundreds, perhaps thousands, of hours of the work of lawyers and millions of dollars of legal expense because of an error that a reasonable person would not view as creating an appearance of impropriety. That would not serve the statutory purpose. It would be seen as a strike against reason in the judicial system.

### 5.   Vacatur

The decision not to recuse makes it unnecessary to address the issue of vacatur. It is appropriate also to note that the decision not to recuse will result as well in the issuance of the opinion that was in preparation on May 10th when the presiding judge realized that he owned 80 shares of CenturyLink.

### 6.   Reference To Another Judge

In its reply brief CenturyLink observed that, because Sprint had filed an "unseemly brief" on the recusal issue, the recusal issue perhaps should be referred to another judge in the district. That is not necessary because CenturyLink's premise

is in error.  Sprint's counsel did not file an "unseemly brief."
Indeed, Sprint's counsel did precisely what should be done.  The
brief presented a fair argument as strongly and effectively as
it could be presented.

Counsel owed it to their client, and indeed to the Court,
to present the facts as they saw them and not to mince words or
soft-pedal the points they were making.  While   the   presiding
judge was (and remains) certainly embarrassed about his lack of
awareness  of  the  financial  interest  discovered  on  May  10,
counsel's brief, while direct, gave no offense.  In fact, having
the issues presented in a straight-forward and effective way was
helpful to sorting out and resolving the issues.

## CONCLUSION

For  the  reasons  set  forth  above,  having  found  that  the
rules  do  not  require  recusal,[11]  and  that  recusal  would  in  fact
undermine  the  statutory  purpose  of  promoting  public  confidence

---

[11] Judges are as much obliged to deny recusal motions when recusal
is not appropriate as they are to grant those motions when
recusal is appropriate.  Hinman v. Rogers, 831 F.2d 937, 939
(10th Cir. 1987); In re Drexel Burnham Lambert Inc., 861 F.2d
1307, 1312 (2d Cir. 1988), cert. denied, 490 U.S. 1102 (1989);
Southwestern Bell Telephone Co. v. F.C.C., 153 f.3D 520, 523
(8th Cir. 1998); U.S. v. Holland, 519 F.3d 909 (9th Cir.
2008)("[I]n the absence of a legitimate reason to recuse
himself, 'a judge should participate in cases assigned.')(citing
Maier v. Orr, 758 F.2d 1578, 1583 (Fed. Cir. 1985); United
States v. Snyder, 235 F.3d 42, 46 (1st Cir. 2000)).

in the judiciary, CENTURYLINK'S MOTION FOR DIVESTITURE OR, IN THE ALTERNATIVE, FOR RECUSAL WITHOUT VACATUR (Docket No. 200) will be granted insofar as it opposes recusal and asks that the presiding judge continue to preside over the case, and will be denied as moot insofar as divestiture is sought, and the alternative relief of reference to another judge will be denied.

It is so ORDERED.

_____/s/_____ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 12, 2011