IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CENTRAL TELEPHONE CO.
OF VIRGINIA, et al.,

    Plaintiffs,

v.                    Civil Action No. 3:09cv720

SPRINT COMMUNICATIONS CO.
OF VIRGINIA, INC., et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on Count III of the Sprint Defendants' (collectively, "Sprint") FIRST AMENDED COUNTERCLAIM (Docket No. 95) ("Counterclaim") against the Plaintiffs Carolina Telephone and Telegraph Company and Central Telephone Company (collectively, "CenturyLink").  Count III of the Counterclaim alleges breach of contract, specifically, that CenturyLink "billed Sprint intrastate switched access rates for minutes of use delivered on local interconnection trunks that did not qualify to be billed as intrastate access in accordance with the [contract executed between the parties]" between November 2007 through November 2008.  Counterclaim ¶ 25.  According to Sprint, CenturyLink over-billed Sprint in the amount of $3,638,685.64 because CenturyLink impermissibly used billing party numbers (BTNs) to classify Sprint's calls as local or non-local for the

purpose of calculating Sprint's invoices.   The Court conducted a two-day bench trial on the matter on December 14-15, 2010.

Sprint's   Counterclaim   is   the   second   phase   of   this litigation.   On August 23-27 and continuing on September 13, 2010, the Court conducted a bench trial on CenturyLink's breach of contract claim against Sprint, as alleged in Count I of CenturyLink's COMPLAINT (Docket No. 1).[1]   That proceeding, to date, has culminated in a PARTIAL FINAL JUDGMENT ORDER (Docket No. 187) and accompanying MEMORANDUM OPINION (Docket No. 180) entering judgment for CenturyLink on its breach of contract claim in the amount of $23,376,213.76.   The initial phase of the litigation addressed whether, under eighteen interconnection agreements ("ICAs")[2] executed between the parties (including the

---

[1] CenturyLink's breach of contract claim against Sprint in the first phase of the litigation involved more than just CenturyLink's North Carolina companies. In addition to Carolina Telephone and Telegraph Company and Central Telephone Company (collectively referred to as "CenturyLink" throughout this opinion), the following CenturyLink entities were party plaintiffs in the first phase of the litigation: Central Telephone Company of Virginia; United Telephone Southeast, LLC; Embarq Florida, Inc.; United Telephone Company of Indiana, Inc.; United Telephone Company of Kansas; United Telephone Company of Eastern Kansas; United Telephone Company of Southcentral Kansas; Embarq Missouri, Inc.; Embarq Minnesota, Inc.; United Telephone Company of the West; United Telephone Company of New Jersey, Inc.; United Telephone of Ohio; United Telephone Company of the Northwest; United Telephone Company of Pennsylvania, LLC; United Telephone Company of the Carolinas LLC; United Telephone Company of Texas, Inc.; and Central Telephone Company of Texas.

[2] In 1996, Congress enacted the Telecommunications Act.  The Act requires that, upon request, all incumbent local exchange

North Carolina ICA at issue here), Sprint owed CenturyLink access charges for the termination of non-local calls originated in a format known as "Voice over Internet Protocol" ("VoIP"). The Court held that the ICAs unambiguously obligated Sprint to pay access charges for such services. See generally MEMORANDUM OPINION (Docket No. 180).

INTRODUCTION

For the reasons set forth below, judgment will be entered for CenturyLink on Count III of Sprint's Counterclaim. The North Carolina Interconnection Agreement ("NC ICA"), the language of which, it is undisputed, governs Count III of Sprint's Counterclaim, clearly does not prohibit the billing-party-number ("BTN") method of classifying traffic as local or non-local that CenturyLink employed for billing purposes from November 2007 through November 2008 (the "Dispute Period").[3]   In

---

carriers ("ILECs"), such as CenturyLink, must interconnect their networks with those of competing local exchange carriers ("CLECs"), such as Sprint. See 47 U.S.C. § 251(c)(2). Interconnection allows a customer of one carrier to call a customer of another carrier. When this happens, the carrier whose customer initiated the call must compensate the receiving carrier for transporting and terminating the call through its network. The Act also requires ILECs and CLECs to negotiate ICAs to establish the terms by which they will compensate one another for use of the other's network. Id. § 251(b), (c)(1). All ICAs must be approved by a state regulatory commission before they become effective. Id. § 252(e).

[3] Sprint claims that CenturyLink breached the NC ICA for failing to "correctly identify the originating points and terminating points of calls so that the traffic would be properly classified

fact, the NC ICA, on its face, says nothing about how traffic bound for CenturyLink's local network is to be classified for billing purposes.  Instead, it incorporates a telecommunications industry publication by reference that explicitly permits use of BTNs to determine the originating points of calls.  The effect of the NC ICA's incorporation of the industry publication permitting that use of BTNs is that, contrary to the allegations in Sprint's Counterclaim, CenturyLink did not breach the NC ICA when it used BTNs to determine the originating points of calls, and ultimately to classify them as local or non-local (alternatively, "jurisdictionalize") for billing purposes during the Dispute Period.

Alternatively, even if the NC ICA did not clearly permit the BTN method of "jurisdictionalizing" calls that CenturyLink employed to generate Sprint's bills during the Dispute Period, the NC ICA is at best ambiguous on the issue.  Because Sprint drafted the NC ICA, any such ambiguity would be construed against it under the rule of *contra proferentem*.  For that

---

as Local Traffic or non-local traffic for purposes of billing." THE SPRINT DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COUNTERCLAIM COUNT III (Docket No. 170) at 38; see also Trial Tr. 299:13-18 (Sprint's counsel).  Although the Court articulates the breach of contract claim differently than Sprint, the difference is immaterial.  Subsumed under Sprint's argument that CenturyLink issued "improper" bills is that the NC ICA prohibited CenturyLink from using the BTN method of calculating bills that it did during the Dispute Period.  The Court merely restates Sprint's argument with greater specificity.

reason, too, CenturyLink would be entitled to judgment on Count III of the Counterclaim.

## FINDINGS OF FACT

CenturyLink is an incumbent local exchange carrier that provides telephone service in North Carolina.  Sprint is a competitive local exchange carrier ("CLEC") that provides services in North Carolina.  CenturyLink and Sprint were once corporate affiliates, the former being owned and controlled by the latter.  MEMORANDUM OPINION (Docket No. 180) at 4; see also JOINT STIPULATION OF UNCONTROVERTED FACTS ("Joint Stipulation") (Docket No. 106) ¶ 6.  Sprint terminated its affiliation with CenturyLink in May 2006 when Sprint spun off its local telephone division, which housed CenturyLink, into another company.  MEMORANDUM OPINION (Docket No. 180) at 4; see also Joint Stipulation ¶ 7.

Sprint and CenturyLink executed the NC ICA on February 1, 2005, before the May 2006 spin-off of what became CenturyLink.  Thus, when the NC ICA was executed the parties were still corporate affiliates.  See Ex. 28 (stating date of execution of agreement as "February 1, 2005").  The NC ICA was drafted and prepared by Sprint executives and Sprint's in-house lawyers.[4]

---

[4] According to Sprint's counsel, the NC ICA was prepared and drafted in identical fashion to the other seventeen ICAs that were at issue in the first phase of this trial.  That is, Sprint drafted the template language that became the various sections

Trial Tr. 11:20-12:9 (Sprint's counsel). It establishes the rates, terms, and conditions for local interconnection between Sprint and CenturyLink in North Carolina, just as the ICAs implicated in the first phase of the litigation establish rates, terms, and conditions for local interconnection for their respective states. Also mirroring the ICAs at issue in the first trial phase, the impetus for the NC ICA was Sprint's provision of wholesale telecommunications services to various cable companies. In order to meet contractual obligations with the cable companies, Sprint had to arrange for CenturyLink to terminate calls placed by the cable companies' customers over CenturyLink's North Carolina network.

Because there was a transition services agreement separate from the NC ICA,[5] CenturyLink did not bill Sprint for minutes delivered on its local interconnection trunks in substantial magnitude in North Carolina until November 2007. Id. at 158:20-

---

of the NC ICA. See Trial Tr. (First Phase of the Litigation) 808:25-809:5 (Luehring). Sprint's in-house counsel advised the parties on the ICAs during their execution, but these individuals were then, and remain today, Sprint employees. See id. at 690:25-691:1 (Morris), 805:16-17 (Luehring), 960:3-4 (Cowin).

[5] The record does not shed much light on the details of the transition services agreement. Fortunately, the details of it are not important for the Court's purposes. Suffice it to say that the transition services agreement prevented CenturyLink from billing Sprint for services in North Carolina until roughly the beginning of the Dispute Period, November 2007.

24 (Roach).   In 2005, for example, CenturyLink billed Sprint only about $5 total for services in North Carolina.   And, in 2006, the total amount billed remained "very small," even after Sprint's May 2006 spin-off of CenturyLink.   Id. at 158:9-17.

Three types of traffic terminate on CenturyLink's North Carolina local interconnection trunks[6]: local traffic, non-local intrastate access traffic, and non-local transit traffic.   Each type of traffic is subject to different billing arrangements and billing rates under the terms of NC ICA.   See generally Ex. 28 §§ 38 ("INTERCARRIER COMPENSATION"), 43 ("TRANSIT TRAFFIC").   Thus, in order for CenturyLink to bill Sprint for traffic delivered to its North Carolina network, CenturyLink had to "jurisdictionalize" Sprint's inbound traffic.   See Trial Tr. 255:8-16 (Hunsucker).

Section 1.40 of the NC ICA defines "Local Traffic": "for purposes of [the NC ICA] the Parties shall agree that 'Local Traffic' means traffic . . . that is originated and terminated within Sprint's local calling area . . . ."   Ex. 28 § 1.40. Section 38.1 of the NC ICA establishes the compensation mechanism for "Local Traffic" as "Bill and Keep."   "Under Bill and Keep," Section 38.1 provides, "each party retains the revenues it receives from end user customers, and neither pays

---

[6] The local interconnection trunks provide a connection between the Sprint CLEC switch and various CenturyLink switches for purposes of routing traffic between the parties.

the other Party for terminating the Local Traffic . . . ."  Id. § 38.1.  The effect of such language was that, under the NC ICA, neither party billed the other for traffic classified as local.

Non-local intrastate access traffic and non-local transit traffic—the two other types of Sprint traffic terminated on CenturyLink's North Carolina network—are not subject to "Bill and Keep" under the NC ICA.  Section 38.2 of the NC ICA sets forth the compensation mechanism for the termination of non-local "toll traffic" which includes non-local intrastate access traffic.  Specifically, Section 38.2 provides that toll traffic, and thus non-local intrastate access traffic, is subject to "the applicable access charges": approximately 4.4 to 4.5 cents per minute during the Dispute Period.  Ex. 28 § 38.2; Trial Tr. 254:15-17 (Hunsucker).[7]  Meanwhile, Section 43.4.1.1 of the NC ICA sets forth the compensation mechanism for the termination of non-local transit traffic.  Pursuant to that section, Sprint is to pay CenturyLink a "transit service charge": roughly .28 or .24 cents per minute depending on which CenturyLink entity terminates the transit traffic.  Ex. 28 § 43.4.1.1; Trial Tr. 254:18-25 (Hunsucker).

---

[7] The applicable access charges are found in tariffs that the NC ICA (like the other ICAs implicated in the initial trial phase) incorporates by reference.  See MEMORANDUM OPINION (Docket No. 180) at 23-26.

Due to the three distinct mechanisms prescribed by the NC ICA, CenturyLink had to "jurisdictionalize" Sprint's inbound traffic to bill for its termination. The text of the NC ICA itself does not prescribe a specific method of "jurisdictionalizing" traffic as local (subject to "Bill and Keep") or non-local (subject to the applicable access charges) for billing purposes. There is a provision—Section 42—in the NC ICA entitled "USAGE MEASUREMENT." Ex. 28 § 42. Thereunder Section 42.1 states:

> Each Party shall establish terminating interconnection minutes of use based on standard AMA recordings made within each Party's network, these recordings being necessary for each Party to generate bills to the other Party. In the event either Party cannot measure minutes terminating on its network where technically feasible, the other Party shall provide the measuring mechanism or the Parties shall otherwise agree on an alternate arrangement.

Id. § 42.1. "AMA recordings" is defined in the NC ICA. Section 1.6 defines the term as follows:

> 'Automated Message Accounting' ('AMA') is the structure inherent in switch technology that initially records telecommunication message information. AMA format is contained in the Automatic Message Accounting document, published by Telcordia as GR-1100-CORE which defines the industry standard for message recording.

Id. § 1.6; see also Trial Tr. 239:1-4 (Hunsucker). The Telcordia "GR-1100-CORE" document referenced in Section 1.6 is

9

published by a "standards body" in the telecommunications industry.  Trial Tr. 115:3-9 (Roach).  The document itself provides that, for the purpose of generating AMA recordings and thus billing for traffic, the originating number field "may be populated with a billing number.  Billing numbers are LEC-assigned . . . ."  Ex. 93.  The record establishes that such language has been in each Telcordia GR-1100-CORE edition from December 2003 to December 2008; thus, it was in the Telcordia GR-1100-CORE documents preceding, contemporaneous with, and subsequent to the Dispute Period.  See id.; see also Trial Tr. 246:3-248:10 (Hunsucker).  During the Dispute Period, Sprint was familiar with Telcordia as an industry standards body.  For reasons neither explained nor readily apparent, Sprint did not consult Telcordia's GR-1100-CORE publication before filing its Counterclaim.  Trial Tr. 120:18-122:3 (Roach).

As noted above, CenturyLink did not bill Sprint for minutes delivered on its local North Carolina trunks in substantial magnitude until November 2007.  However, before November 2007 (dating to February 1, 2005, the day of the NC ICA's execution), for the small amount of traffic for which CenturyLink did bill Sprint, CenturyLink used BTNs to "jurisdictionalize" Sprint's calls.  Specifically, CenturyLink compared BTNs associated with its local interconnection trunks to the called party number to classify traffic as local or non-local, and it then applied the

number of minutes classified as local or non-local to their corresponding rates under the NC ICA (i.e., "Bill and Keep" for local traffic and the "applicable access rates" for non-local traffic) to calculate Sprint's bills. Id. at 213:13-20 (Hunsucker). Pursuant to this billing method, the BTNs acted as proxies, or estimates, of the originating points of Sprint's calls, since they were affiliated with trunks that each serviced numerous calls, not ten-digit telephone numbers unique to individual customers. The called party number, on the other hand, served as a precise measure of the ending points of Sprint's calls, since, unlike BTNs, they were associated with ten-digit telephone numbers unique to individual customers.

Before June 21, 2005, CenturyLink, not Sprint, supplied the BTNs that CenturyLink compared to the called party numbers to "jurisdictionalize" Sprint's calls. Id. at 212:24-213:4. By way of an email dated June 21, 2005, CenturyLink—still then a Sprint affiliate—advised its CLEC customers, including Sprint, that going forward the CLEC customers, not CenturyLink, would be responsible for supplying the BTNs used by CenturyLink to "jurisdictionalize" traffic for billing purposes. Specifically, the email stated, "The purpose of this notification is to inform you [Sprint and CenturyLink's other CLEC customers] of an upcoming change to ordering and provisioning procedures to

11

assure correct usage billing on trunks." Ex. 33. The email continued:

> When CLECs establish interconnection with [CenturyLink] for terminating traffic to our network, the BTNs (Billing Telephone Numbers) associated with the serving rate center must be assigned to the CLEC trunk group . . . to allow for proper Automatic Message Accounting (AMA) record creation. Omission of CLEC BTNs causes incorrect usage billing to occur.

Id. The email set August 2, 2005, as the date in which CenturyLink's new policy was to take effect, and it provided an example of the "ASR" order form which the CLEC customers, such as Sprint, were to complete and submit to CenturyLink to order interconnection services. Id.

Sprint's network department received the June 21, 2005, email. See Ex. 92; see also Trial Tr. 132:20-22 (Roach). In fact, at Sprint's behest, to remove any connotation that the order form pertained only to wireless traffic, CenturyLink changed the name of the field on the ASR order form in which the BTN was to be entered—from "WSTN" to "ISTN." See Ex. 92 (email of Kim Bruce dated Aug. 26, 2005); see also Trial Tr. 131:17-132:8 (Roach). There is no doubt that Sprint understood CenturyLink's June 21st email notice to have related to billing because it admitted as much at trial. Trial Tr. 127:23-25 (Roach).

Between December 19, 2005, and July 20, 2007, Sprint submitted sixty-one ASR forms to CenturyLink for interconnection services in North Carolina.  See Ex. 89.  And, consistent with the substance of the email notice from CenturyLink, Sprint populated the ASR order forms' "ISTN" field (so-called because of Sprint's pressing CenturyLink to change that field's name) with a ten-digit BTN.  See Ex. 89; see also Trial Tr. 133:25-134:15 (Roach), 226:14-227:5 (Hunsucker).  CenturyLink, in turn, just as it indicated it would, used the BTNs supplied by Sprint in North Carolina to "jurisdictionalize" Sprint's traffic and bill for its termination during the Dispute Period.  Trial Tr. 139:2-7 (Roach).

Because Sprint failed to heed the June 21st email notice's directive to populate the ISTN field on the ASR with a BTN "associated with the serving rate center," it only submitted four different BTNs for the entire state of North Carolina.  See Trial Tr. 235:6-8 (Hunsucker).[8]  CenturyLink "jurisdictionalized" Sprint's North Carolina traffic during the Dispute Period using

---

[8] It now appears that, in submitting BTNs to CenturyLink, Sprint did not heed the instructions in the June 21st email to associate the BTNs with the serving rate center.  Sprint submitted BTNs at the "Local Access and Transit Area" ("LATA") level, not at the "serving rate center" level called for by the email.  See Exs. 89-90; see also Trial Tr. 234:23-235:5 (Hunsucker).  BTNs supplied at the LATA level are geographically less precise than BTNs supplied at the serving rate center level.  See Ex. 87 § 3.9; Ex. 90; see also Trial Tr. 214:4-215:7 (Hunsucker).

the four BTNs that Sprint submitted and billed Sprint accordingly.

At no time during the Dispute Period did Sprint object to CenturyLink's use of the four BTNs that Sprint had submitted as proxies for the originating points of Sprint's calls terminated over CenturyLink's local interconnection network. In fact, Sprint paid CenturyLink's invoices as they were issued without protest.[9]

On May 3, 2007, CenturyLink announced a system known as "Module 164." Ex. 91-A. After its announcement CenturyLink began to install Module 164 on a rolling basis over its multi-state network. Module 164 enabled CenturyLink's switches to capture calling party numbers ("CPNs") for traffic delivered over its local interconnection trunks. See id. CPNs are the ten-digit telephone numbers unique to individual parties placing telephone calls. CenturyLink installed Module 164 in North Carolina in October 2008. Trial Tr. 256:21-257:3 (Hunsucker). Before Module 164 was installed in North Carolina, CenturyLink had lacked the technological capability to capture CPNs for

---

[9] At no time during the Dispute Period did any of CenturyLink's other CLEC customers object to CenturyLink's use of BTNs as proxies for the originating points of their calls terminated over CenturyLink's local interconnection network. Trial Tr. 235:9-237:19 (Hunsucker). In fact, CenturyLink had not received a single complaint from any of its other CLEC customers in this regard as of the trial of Count III of Sprint's Counterclaim. Id.

billing purposes on its local interconnection trunks even though the calls it received from Sprint had carried such information. Id. at 213:22-214:3.   The installation of Module 164 in North Carolina enabled CenturyLink, for the first time, to determine the actual originating points of calls terminated on its local network instead of having to rely on proxy originating points under its BTN method of "jurisdictionalizing" calls.

CenturyLink's switch in October 2008 to Module 164 resulted in a dramatic decrease in the number of minutes CenturyLink billed to Sprint at non-local intrastate access rates in North Carolina.   In line with the drop in minutes, the total dollar amount of CenturyLink's bills to Sprint for intrastate access also decreased too (roughly by a factor of ten) in the three months following the implementation of Module 164 in North Carolina (i.e., October 2008 to December 2008).   Ex. 137 (data in row entitled "CENTURYLINK TRA CPM"); see also Trial Tr. 76:7-14 (Roach). To illustrate, CenturyLink billed Sprint $477,793.81 in intrastate access charges in North Carolina in September 2008, the month directly preceding the implementation of Module 164 in North Carolina, and CenturyLink billed Sprint just $42,227.50 in intrastate access charges in North Carolina in December 2008.   Additionally, CenturyLink billed Sprint no more than $47,691.05 in intrastate access charges in North Carolina in any individual month for the year following the Dispute

Period (i.e., 2009) when, in any individual month during the Dispute Period, CenturyLink billed Sprint no less than $135,980.71 in intrastate access charges.   Ex. 137.

CenturyLink offered no justification for the precipitous and sustained drop in intrastate access charges billed to Sprint in North Carolina beyond its implementation of Module 164 in October 2008 and that system's use of CPNs, rather than BTNs, to generate AMA recordings to calculate Sprint's bills.   Given the magnitude of the decreases in amounts billed to Sprint, the temporal alignment of the decreases immediately after CenturyLink's use of Module 164 in its billing processes, and CenturyLink's inability to offer a plausible alternative explanation for such decreases, it must be concluded that CenturyLink's use of Module 164, beginning in October 2008 in North Carolina, was responsible for the decreased billing.

As early as July 2008, in internal email correspondence, Sprint questioned whether CenturyLink's intrastate access charges in North Carolina were "high."   See Ex. 91-B. Thereafter, but still before the commencement of this litigation, Sprint even questioned CenturyLink directly about its North Carolina bills.   CenturyLink offered two explanations, none of which seemed plausible to Sprint.   Trial Tr. 61:11-65:9 (Roach).   Notwithstanding Sprint's apparent disquietude with what it perceived to be inexplicably high North Carolina

invoices from CenturyLink, at no time in 2008, 2009, or 2010 did Sprint invoke the dispute resolution provisions in Section 23 of the NC ICA. In fact, Sprint raised the issue for the first time when it filed its Counterclaim in this action on August 9, 2010.

During the Dispute Period, CenturyLink lacked a benchmark against which to measure the bills it issued Sprint for services in North Carolina. This was because, before November 2007 (the first month of the Dispute Period), when the parties' transition services agreement was still operative, CenturyLink did not bill Sprint in significant quantities for traffic terminated on its local network in North Carolina. See id. at 158:9-24, 159:1-23 (Roach).

## CONCLUSIONS OF LAW

### I. North Carolina Contract Law Controls This Dispute

North Carolina contract law controls Count III of Sprint's Counterclaim. The NC ICA contains a "GOVERNING LAW" provision, the effect of which is that the NC ICA is to be governed by state law to extent that state law does not conflict with federal law and federal rules and regulations. See Ex. 28 § 16.1. Count III of Sprint's Counterclaim implicates neither federal regulations nor federal statutes, and thus the NC ICA must be construed according to North Carolina law.

In North Carolina, the elements of a claim for breach of contract are: (1) the existence of a valid contract; and (2)

breach of the terms of that contract.  Jackson v. California Hardwood Co., 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995).  A court's primary purpose in construing a contract is to ascertain the intent of the parties at the time of the contract's execution.  Lane v. Scarborough, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973).  "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be."  Crockett v. First Fed. Savings & Loan Ass'n of Charlotte, 289 N.C. 620, 631, 224 S.E.2d 580, 588 (1976).  "However, if the language is uncertain or ambiguous, the court may consider all the surrounding circumstances, including those existing when the document was drawn . . . and the construction which the parties have placed on the language, so that the intention of the parties may be ascertained and given effect."  Century Communications, Inc. v. Housing Auth. of City of Wilson, 313 N.C. 143, 145-46, 326 S.E.2d 261, 264 (1985).  A contract is not ambiguous merely because the parties differ on how to interpret its terms.  Walton v. City of Raleigh, 342 N.C. 879, 467 S.E.2d 410, 412 (1996).  Unambiguous contracts are interpreted by the court as a matter of law.  First-Citizens Bank & Trust Co. v. 4325 Park Rd. Assocs., 133 N.C. App. 153, 515 S.E.2d 51, 54 (1999); World-Wide Rights Ltd. P'ship v. Combe, Inc., 955 F.2d 242, 245 (4th Cir. 1992).  When

an ambiguity is present in a contract, the court is to construe the ambiguity against the drafter—the party responsible for choosing the questionable language. Station Assoc. Inc. v. Dare County, 130 N.C. App. 56, 62, 501 S.E.2d 705, 708 (1998), rev'd on other grounds, 350 N.C. 367, 513 S.E.2d 789 (1999).

## II. CenturyLink Did Not Breach The Terms Of The NC ICA

Although the NC ICA establishes certain billing requirements, none of those requirements prohibited CenturyLink from using the BTN method of "jurisdictionalizing" calls for billing purposes that it did during the Dispute Period. See generally Ex. 28 § 57 (section captioned "BILLING"). Relatedly, none of those billing requirements obligated CenturyLink to "jurisdictionalize" calls for billing purposes using CPNs during that period. See generally id. In fact, there is not a provision anywhere in the NC ICA that either explicitly prohibits using BTNs for billing purposes or explicitly requires using CPNs for billing purposes.

### A. Sprint's Arguments Are Irrelevant And Unpersuasive

To support its argument that CenturyLink breached the NC ICA, Sprint calls upon several provisions, none of which pertain to the only question of relevance here, namely, how traffic was to be "jurisdictionalized" for billing purposes under the NC ICA. Sprint focuses on the fact that Section 1.40 of the NC ICA

defines "Local Traffic" as "traffic . . . that is originated and terminated within [CenturyLink's] local calling area . . . ." Id. § 1.40.  Based on this provision, Sprint argues that the NC ICA requires local traffic to be determined based on the actual originating and terminating points of calls in CenturyLink's network.  Sprint also spotlights Section 57.2 of the NC ICA for the proposition that "CenturyLink is obligated [under the NC ICA] to bill [Sprint] properly."   THE SPRINT DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COUNTERCLAIM III ("Sprint's Prop. Fact & Law") (Docket No. 170) at 38. Section 57.2 reads in its entirety, "[CenturyLink] shall bill [Sprint] for each service supplied by [CenturyLink] to [Sprint] pursuant to this Agreement at the rates set forth in this Agreement."  Ex. 28 § 57.2.  Finally, Sprint highlights that Section 38.1 of the NC ICA provides that local traffic terminated over CenturyLink's network is subject to "Bill and Keep," meaning that Sprint is not obligated to pay CenturyLink for the termination of local traffic.

In arguing that the above provisions of the NC ICA are dispositive of its breach of contract claim against CenturyLink, Sprint misconstrues the NC ICA's billing provisions entirely. Sprint is correct that Section 1.40 defines "Local Traffic" as traffic that originates and terminates in CenturyLink's local calling area; however, that provision does not resolve—or, for

that matter, even address—the question on which Sprint's Counterclaim rests: what, if anything, the NC ICA provides regarding how the originating and terminating points of calls were to be determined for the purpose of billing. Sprint's reliance on Section 57.2 is also misplaced. First, that section, contrary to Sprint's assertions, does not state that CenturyLink had to bill Sprint "properly"; it merely states that CenturyLink had to bill sprint "pursuant to [the NC ICA] at the rates set forth [in the NC ICA]." Second, even if that provision stated what Sprint (inaccurately) claims it does, the critical question would be what qualifies as a "proper" method of billing under the NC ICA. Tellingly, Sprint leaves that question unanswered. It does so because no provision in the NC ICA supports its argument. Lastly, Section 38.1 speaks only to the type of compensation due under the NC ICA for local traffic (i.e., "Bill and Keep"), an issue which is wholly distinct from the first-order issue of how CenturyLink was to classify traffic as local under the NC ICA.

**B.** **The NC ICA Does Not Mandate A Specific Method Of "Jurisdictionalizing" Traffic For The Purpose Of Billing**

Sprint's protestations notwithstanding, the NC ICA does not prescribe a particular method of "jurisdictionalizing" traffic for billing purposes. Instead, it incorporates by reference a standard set forth in a separate industry publication that—

before, contemporaneous with, and after the Dispute Period—permitted use of BTNs for "jurisdictionalizing" calls for billing purposes.

Sections 42.1 and 1.6 of the NC ICA operate in tandem to incorporate the permissive industry standard. Section 42.1 provides in relevant part: "Each Party shall calculate terminating interconnection minutes of use based on standard AMA recordings made within each Party's network, those recordings being necessary for each party to generate bills to the other party." Id. § 42.1. Section 1.6 defines Section 42.1's reference to "AMA recording": "'Automated Message Accounting' ('AMA') is the structure inherent in switch technology that initially records telecommunication message information. AMA format is contained in the Automated Message Accounting document, published by Telcordia as GR-1100-CORE which defines that industry standard for message recording." Id. § 1.6; see also Trial Tr. 239:1-4 (Hunsucker). Sprint itself acknowledged that, pursuant to Section 42.1, CenturyLink billed Sprint based on minutes of use as measured by standard AMA recordings. Trial Tr. 113:18-22 (Roach). From at least December 2003 through December 2008, and thus for the entirety of the Dispute Period, the Telcordia GR-1100-CORE document referenced in Section 1.6 expressly provided that the origination field "may be populated with a billing number." See Ex. 93 (Fed. R. Evid. 1006 summary

22

of Telcordia GR-1100-CORE documents, Dec. 2003 to Dec. 2008). The effect of such language is that AMA recordings could be generated using BTNs to determine the originating points of calls terminating on CenturyLink's network. The industry manual incorporated by the NC ICA, in other words, sanctioned CenturyLink's use of a BTN method to calculate Sprint's North Carolina bills during the Dispute Period.

### C. The Record Does Not Support Sprint's Interpretation Of Section 42.1 Of The NC ICA

Sprint insists that Section 42.1 does not permit use of BTNs to determine the originating points of calls. Significant for Sprint is that Section 42.1 states that "minutes of use" are to be based on "standard AMA recordings." Ex. 28 § 42.1. Sprint further notes that Section 42.2 also speaks to "minutes of use," providing that they shall be measured in "actual conversation minutes" and "rounded to the next whole minute." Id. § 42.2. According to Sprint, the fact that Sections 42.1 and 42.2 contain the phrase "minutes of use" shows that the parties intended those sections to address measurement of traffic in quantitative terms only, not "jurisdictionalization" of traffic as local or non-local. Sprint's Prop. Fact & Law (Docket No. 170) at 8.

Sprint's argument reads Section 42.1 too narrowly. The record shows that "AMA recording is a format that's used [by

CenturyLink] to create the information necessary to <u>bill the</u> <u>appropriate charge</u> [to Sprint].  And it's based on the software that's located in the terminating switch."  Trial Tr. 239:1-4 (Hunsucker) (emphasis added); Ex. 28 § 42.1 (Each Party shall calculate terminating interconnection minutes of use based on standard AMA recordings . . . , <u>these recordings being necessary</u> <u>for each Party to generate bills to the other Party</u>." (emphasis added)).  Although Sprint is correct that Section 42.1 relates to measurement of "minutes of use," Section 42.1 also relates to the "jurisdictionalization" of minutes, because the latter, like the former, is necessary to "bill the appropriate charge" under the NC ICA.  The measurement of minutes, as a practical matter, necessarily entails the determination of <u>which</u> minutes are being measured—local or non-local ones.  As CenturyLink's director of CLEC management confirmed in response to an inquiry about the scope of Section 42.1, "you can measure the total minutes, but then you [have] got to measure what's interstate access and you [have] got to measure what's local, and BTN was the mechanism by which [CenturyLink] did that."  Hunsucker Deposition 19:4-11. It is most reasonable, therefore, to interpret Section 42.1's reference to "AMA recordings," the definition of which in Section 1.6 references the Telcordia GR-1100-CORE manual, which in turn allows BTN-based billing, to set permissive standards

for "jurisdictionalizing" calls for billing purposes under the NC ICA.[10]

Sprint uses Section 38.7's reference to a "Percent Local Usage factor" to obfuscate the reasonableness of the above conclusion. Sprint first notes that "Percent Local Usage," or "PLU," is a term defined in Section 1.54 of the NC ICA as "a calculation which represents the ratio of the local minutes to the sum of local and intraLATA toll minutes between exchange carriers sent over Local Interconnection Trunks." Sprint then notes that Section 38.7 and 38.7.1 state:

> 38.7 [Sprint] will identify the Percent Local Usage (PLU) factor on each interconnection order to identify its 'Local Traffic,' as defined herein, for reciprocal compensation purposes. . . .
> 38.7.1 To the extent technically feasible, each Party will transmit calling party number (CPN) for each call being transmitted on the other's network. If the percentage of calls transmitted with CPN is greater than 90%, all calls exchanged without CPN will be billed as local or intrastate in proportion to the [minutes of use] of calls exchanged with CPN. If the percentage of calls transmitted with CPN is less than 90%, all calls

---

[10] That the NC ICA incorporates by reference an industry standard, such as the billing standard set forth in Telcordia GR-1100-CORE, is further supported by Section 57.1 of the NC ICA. Section 57.1, housed under Section 57's "BILLING" heading, provides: "[CenturyLink] shall comply with various industry, OBF, and other standards referred to throughout [the NC ICA]." Ex. 28 § 57.1.

> transmitted without CPN will be billed
> as intraLATA toll traffic.

Ex. 28 § 38.7, 38.7.1.  According to Sprint, the PLU factor referred to in Section 38.7 is an "alternative mechanism" on which CenturyLink was to rely "[i]n the event [it] was unable to classify a Sprint call as Local Traffic or non-local for purposes of intercarrier compensation."  Sprint's Prop. Fact & Law (Docket No. 170) at 17.  The fact that the PLU factor was not used by CenturyLink during the Dispute Period is not important to Sprint.  By its own admission, Sprint cites Section 38.7, and that section's reference to a PLU factor, for a limited purpose.  In Sprint's words, it "is not asserting that the PLU usage [sic] factor should have been applied [by CenturyLink here]; rather, Sprint submits that the North Carolina ICA itself provided a default mechanism—namely, the PLU factor—for billing in the event jurisdiction of a [call] could not be determined" by CenturyLink.   THE SPRINT DEFENDANTS' RESPONSE TO CENTURYLINK'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COUNTERCLAIM COUNT III (Docket No. 172) at 27.  Sprint continues:

> [t]he presence of the PLU factor mechanism in the North Carolina ICA for billing when jurisdiction cannot be determined underscores the fallacy of CenturyLink's theory that Section 42.1 of the North Carolina ICA, relating to measuring minutes of use, somehow authorized CenturyLink to invent its own BTN proxy mechanism to

> determine jurisdiction. Simply put, the PLU
> factor, not Section 42.1, was the
> appropriate mechanism to bill under the ICA
> when jurisdiction cannot be determined, but
> CenturyLink developed and used its own BTN
> method contrary to the provisions of the
> North Carolina ICA.

Id.

Sprint's PLU argument is not convincing. Its most obvious shortcoming is that Sections 38.7 and 38.7.1—the two sections Sprint cites—nowhere state that the PLU factor was to be used as a default mechanism in the event the jurisdiction of a call could not be determined. The sections therefore do not say what Sprint claims they do. Sprint's argument depends on Sections 38.7 and 38.7.1 establishing a default mechanism for "jurisdictionalizing" calls that thereby calls into question Section 42.1's applicability to the "jurisdictionalization" of traffic under the NC ICA; because Sprint fails to prove that Sections 38.7 and 38.7.1 establish such a default mechanism, the corollary of their argument—that Section 42.1's scope does not extend to the "jurisdictionalization" of traffic under the NC ICA—is unsubstantiated. Additionally, even if Sprint had shown that Sections 38.7 and 38.7.1 establish a mechanism for "jurisdictionalizing" traffic when circumstances otherwise made that impossible, this feature of Sections 38.7 and 38.7.1 would not undermine Section 42.1's applicability to the "jurisdictionalization" of traffic for AMA recording, and thus

27

billing, purposes.  To reiterate, Section 42.1's reference to "measure[ing] minutes" does not transform that section into a provision that reasonably can only be read to pertain to the quantification of minutes.  As the record clearly demonstrates, the quantification of minutes is a process that is inextricably linked with the "jurisdictionalization" of minutes.  The former process, divorced from the latter, is of no practical significance.

Also, the Court would be remiss if it failed to note that Section 42.1 contains language that is similar to the interpretation that Sprint asks the Court to ascribe to Sections 38.7 and 38.7.1 (notwithstanding the fact that the language of those sections does not support Sprint's interpretation).  The concluding sentence of Section 42.1 provides, "[i]n the event either Party cannot measure minutes terminating on its network where technically feasible, the other Party shall provide the measuring mechanism or the Parties shall otherwise agree on an alternate arrangement."  Ex. 28 § 42.1.  Section 42.1 does not mention a PLU factor by name, but the omission is unimportant.  The fact that Section 42.1 itself provides for a fall-back "mechanism" for "measur[ing] minutes"—a process, as stated, necessarily intertwined with the "jurisdictionalization" of traffic—discredits Sprint's foundational claim that Sections 38.7 and 38.7.1 provide the exclusive default mechanism for

"jurisdictionalizing" traffic under the NC ICA, as well as Sprint's related claim that, because Sections 38.7 and 38.7.1 provide the exclusive default mechanism for "jurisdictionalizing" traffic in the NC ICA, Section 42.1 cannot possibly relate to "jurisdictionalizing" traffic.

### E. The Only Possible Alternative Is That The NC ICA Is Ambiguous As To The Permissibility Of CenturyLink's Use Of BTNs For Billing Purposes

Even if the Court could not find that CenturyLink's use of BTNs for billing purposes was clearly not prohibited by the NC ICA, the closest the Court could come to Sprint's interpretation of the NC ICA would be to conclude that it is ambiguous on that issue. And, under North Carolina law, specifically, the rule of *contra proferentem*, any ambiguity would be construed against Sprint, the drafter of the NC ICA.[11]  See Station Assoc. Inc., 130 N.C. App. at 62, 501 S.E.2d at 708. If Sprint wanted the NC ICA to prohibit CenturyLink's BTN billing method, the law directs that it was incumbent upon Sprint to provide so in clear language in the NC ICA. Moreover, if Sprint did not want the

---

[11] The parties' status as corporate affiliates at the time the NC ICA was executed complicates application of the ambiguity rule. CenturyLink, too, could be considered a "drafter" of the NC ICA because it was a subsidiary of Sprint when the parties entered into the NC ICA. However, the record establishes that Sprint employees outside the company's local telephone division (i.e., not affiliated with CenturyLink) dominated negotiation of the NC ICA's terms, see supra note 4, making Sprint, for all practical purposes, the singular drafter of Section 42.1 and all other provisions.

Telcordia GR-1100-CORE manual to set a permissive standard for both the quantification and "jurisdictionalization" of minutes under the NC ICA, it was incumbent upon Sprint to say so in clear language in the NC ICA. To the extent that Sprint failed in both regards, it did so at its own peril under North Carolina contract law.[12]

The fact that the NC ICA is at best ambiguous on how to "jurisdictionalize" traffic for billing purposes has another noteworthy consequence. Under North Carolina "contract law, where the language presents a question of doubtful meaning and the parties to a contract have, practically or otherwise, interpreted the contract, the courts will ordinarily adopt the construction the parties have given the contract *ante litem motam*," that is, before the commencement of litigation. Davison v. Duke University, 282 N.C. 676, 713-14, 194 S.E.2d 761, 784 (1973) (citations omitted). The record establishes that, as early as June 21, 2005, CenturyLink sent Sprint an email giving

---

[12] The Court recognizes that North Carolina courts have not always invoked the rule of *contra proferentem* to resolve ambiguities against the party who drafted a written agreement. See, e.g., Joyner v. Adams, 87 N.C. App. 570, 361 S.E.2d 902 (1987) (holding that the trial court erred in awarding judgment to the plaintiff based on the "rule that ambiguity in contract terms must be construed most strongly against the party which drafted the contract" where the parties "were at arms length and were equally sophisticated"). Joyner and any other similar cases are inapposite here because, as the record confirms, the NC ICA was not the product of an arms' length transaction. See supra note 4.

notice that BTNs would be used in the billing process.  The
email stated:

> When CLECs establish interconnection with
> [CenturyLink] for terminating traffic to our
> network, the BTNs (Billing Telephone
> Numbers) associated with the serving rate
> center must be assigned to the CLEC trunk
> group . . . to allow for proper Automatic
> Message Accounting (AMA) record creation.
> <u>Omission of CLEC BTNs causes incorrect usage
> billing to occur</u>.

Ex. 33 (emphasis added).  Sprint clearly received the email and
understood its substance to reach, among other subjects,
billing.  <u>See</u> Ex. 92; <u>see also</u> Trial Tr. 132:20-22 (Roach).
Sprint thereafter submitted BTNs to CenturyLink in accordance
with CenturyLink's email notice.  Sprint did this without
protest.  CenturyLink then billed Sprint based on the BTNs the
latter had submitted.  CenturyLink billed Sprint for the
entirety of the Dispute Period—thirteen full months.  Despite
the fact that as early as July 2008 (nine months into the
Dispute Period), Sprint suspected that its North Carolina bills
from CenturyLink were, in its words, "high," <u>see</u> Ex. 91-B,
Sprint did not object to CenturyLink's use of BTNs for billing
purposes during 2008, 2009, or 2010 by invoking the NC ICA's
dispute resolution procedure set forth in Section 23.  In other
words, Sprint's course of conduct before this litigation—from
its honoring CenturyLink's June 21, 2005, email to its decision
not to exercise its right under the NC ICA to lodge a formal

objection to CenturyLink's billing practices in North Carolina—reveals that Sprint placed the same construction on the NC ICA that, throughout the Disputed Period, CenturyLink used BTNs to "jurisdictionalize" traffic for billing purposes.

### F.   Sprint's Argument Runs Afoul Of Basic Tenets Of Contract Law

The task of the Court in interpreting a contract is to determine what, if anything, the contract provides respecting the disputed issue.   The Court's task is not to re-write the contract so that it comports with what a party argues (or even logic dictates) that the contract should have provided on that issue.   The latter, impermissible route is precisely the course that Sprint urges the Court to chart here.   The four corners of the NC ICA simply do not state requirements for how CenturyLink was to "jurisdictionalize" Sprint's calls for the purpose of billing.   It is true, as Sprint points out, that the NC ICA defines "Local Traffic" as that which "is originated and terminated within [CenturyLink's] local calling area."   Ex. 28 § 1.6.   But that definition says nothing about how the "local calling area" is to be determined and, more importantly, it says nothing about how calls are to be "jurisdictionalized" for billing in particular.   The provision in the NC ICA that most directly establishes standards for the "jurisdictionalization" of traffic for billing purposes is Section 42.1, and that

section, in tandem with Section 1.6's definition of "AMA recording," clearly designates an industry manual, the Telcordia GR-1100-CORE, as setting forth standards for the measurement of minutes, which, as discussed repeatedly already, involves both the quantification of minutes and the "jurisdictionalization" of minutes.   The fact that the industry manual explicitly states that BTNs may be used as originating points of calls to generate AMA Recordings which are used for billing purposes means that CenturyLink's use of BTNs as originating points of Sprint's calls for billing purposes was satisfactory under the NC ICA, and, in consequence, non-actionable under contract law.

Evidence that Sprint offers to show that CPN-based billing was more accurate, available, and in use by CenturyLink in other geographic areas during the Dispute Period is irrelevant to Count III of Sprint's Counterclaim.   A claim for breach of contract reduces to consideration of what duties, if any, a contract imposes and whether those duties have been breached. Accordingly, for Sprint to prove a breach of the NC ICA owing to CenturyLink's use of a BTN billing method, it must first prove that the NC ICA imposed a duty not to use a BTN billing method. Here, Sprint fails its predicate task.   Not only does the record show that the NC ICA did not impose a duty not to use BTNs in calculating Sprint's bills, but it also shows that the NC ICA

permitted such use of BTNs by incorporating a standard set forth in an industry publication.

Having found that CenturyLink did not breach the NC ICA, the Court need not address the parties' arguments respecting the availability or amount of damages.

## CONCLUSION

For the reasons set forth above, the Court will enter judgment in favor of CenturyLink on Count III of Sprint's Counterclaim.

It is so ORDERED.

/s/        *R ε ρ*
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December *13* , 2011